## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MGM RESORTS INTERNATIONAL GLOBAL GAMING DEVELOPMENT, LLC )<br><br>*Plaintiff,* )<br><br>v. )<br><br>DANNEL P. MALLOY, in his official capacity as Governor of Connecticut, )<br><br>DENISE W. MERRILL, in her official capacity as Connecticut Secretary of the State, and )<br><br>JONATHAN A. HARRIS, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection )<br><br>*Defendants.* ) | Case No. 3:15-cv-1182-AWT<br><br><br><br>October 5, 2015 |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff MGM Resorts International Global Gaming Development, LLC ("MGM"), by its undersigned attorneys, brings this civil action for declaratory and injunctive relief, and alleges as follows:

### INTRODUCTION

1.      This action challenges as unconstitutional Connecticut Special Act 15-7 (the "Act"), signed into law by Governor Malloy on June 19, 2015. To the exclusion of all other tribes, races, and entities, both in-state and out-of-state, the Act authorizes the two federally-recognized Indian tribes in Connecticut – and only those two tribes (the "Preferred Tribes") – to form a special business entity to negotiate with Connecticut municipalities regarding

establishment of a commercial casino gaming facility. The Act further authorizes the Preferred Tribes to enter into a casino development agreement with a municipality and to submit such an agreement to the Connecticut legislature for approval. In essence, the Act creates an exclusive, no-bid process for the Preferred Tribes to present to the Connecticut legislature a proposal for development of an off-reservation commercial casino in Connecticut.

2.    MGM seeks to have the Act declared invalid and enjoined on two principal bases:

a.    The Act violates the Equal Protection Clause because it is a race-based set-aside in favor of the two Preferred Tribes at the expense of all other tribes, races, and entities; and

b.    The Act violates the dormant Commerce Clause because it discriminates on its face in favor of the two in-state Preferred Tribes at the expense of out-of-state competitors, all of whom are barred from participating in the casino-development process set forth in the Act.

3.    This case is not about tribal gaming as authorized by federal law. To the contrary, the Act is fundamentally inconsistent with federal law governing Indian gaming. Indian tribes may operate gaming facilities *on Indian land* pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, and the Preferred Tribes operate two casinos on their respective reservations in Connecticut under the IGRA. The Act, however, creates a process wholly separate from the IGRA, where the Preferred Tribes may seek to develop a third casino off of Indian lands. Such off-reservation, non-IGRA-authorized casinos are typically referred to as "commercial casinos," in contrast to on-reservation, IGRA-authorized casinos, which are typically referred to as "tribal casinos."

4.    Because the Act is separate from the IGRA and contemplates a commercial casino with no relationship to Indian lands, there is no constitutionally legitimate basis for the Act's discrimination in favor of the Preferred Tribes and against all other potential bidders.

5.      MGM Resorts International ("MGMRI"), the parent of MGM, is one of the world's leading global hospitality companies, operating, through its subsidiaries, a world-renowned portfolio of destination resort brands, including many of the world's finest casino resorts.  MGM is the casino development arm of MGMRI and routinely assesses and pursues commercial casino development opportunities.

6.      MGM is ready, willing, and able to compete for the opportunity to develop a commercial casino gaming facility in Connecticut, but is excluded by the Act from competing for this opportunity.  The Act allows only the Preferred Tribes to negotiate and sign a casino development agreement with a municipality, and it makes the State an active partner in that development process – for example by requiring the Connecticut Department of Consumer Protection to disseminate a request for proposals issued by the Preferred Tribes.  The Act excludes all other entities, including MGM, from competing with the Preferred Tribes to negotiate such a development agreement and presenting such an agreement to the legislature for approval (and so also excludes MGM and all others from the subsequent establishment and operation of the commercial casino gaming facility).

7.      In short, the Act creates an unconstitutional pathway to development of a commercial casino by the Preferred Tribes.  Accordingly, this Court should (i) declare the Act unconstitutional and enjoin the Defendants from enforcing, or otherwise exercising authority under, the Act, (ii) declare that Defendants have violated the Constitution by exercising authority under the Act and direct them to rescind their unconstitutional actions, (iii) declare that any casino development agreement adopted pursuant to the Act is the product of an unconstitutional process and is therefore void, and (iv) declare that any legislation approving any casino development agreement adopted pursuant to the Act is unconstitutional and therefore void.

## THE PARTIES

8.     Plaintiff MGM Resorts International Global Gaming Development, LLC, is a Nevada limited liability company with its principal place of business in Nevada.  Plaintiff is a wholly-owned subsidiary of MGM Resorts International, a Delaware corporation with its principal place of business in Nevada, which owns a portfolio of destination integrated resorts providing hospitality, gaming, and other entertainment offerings.  MGM Resorts International Global Gaming Development is responsible for MGMRI's casino development efforts, including assessment and pursuit of casino development opportunities.  Once MGM develops a casino, responsibility for casino operations shifts from MGM to a separate MGMRI subsidiary.

9.     Defendant Dannel P. Malloy is the Governor of Connecticut and is sued solely in his official capacity.  Governor Malloy maintains his principal office at the State Capitol, Office of the Governor, 210 Capitol Avenue, Hartford, Connecticut 06106.

10.     Defendant Denise W. Merrill is the Connecticut Secretary of the State and is sued solely in her official capacity.  Secretary Merrill maintains her principal office at the Office of the Secretary of the State of Connecticut, 30 Trinity Street, Hartford, Connecticut 06106.

11.     Defendant Jonathan A. Harris is the Commissioner of the Connecticut Department of Consumer Protection and is sued solely in his official capacity.  Commissioner Harris maintains his principal office at the Department of Consumer Protection, 165 Capitol Avenue, Hartford, Connecticut, 06106.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202 to redress violations of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  All Defendants reside in this judicial district.

## FACTUAL BACKGROUND

### A.     Tribal Gaming in Connecticut

14.     There are two federally-recognized Indian tribes in Connecticut: the Mashantucket Pequot Indian Tribe and the Mohegan Tribes of Indians of Connecticut (the "Preferred Tribes").  *See* 80 Fed. Reg. 1,942, 1,944-45 (Jan. 14, 2015).  The Mashantucket Pequot Indian Tribe operates the Foxwoods casino, and the Mohegan Tribes of Indians of Connecticut operates the Mohegan Sun casino; both casinos are in Connecticut on each tribe's respective reservation.  These two tribal casinos are the only casino gaming facilities in Connecticut, and they are operated pursuant to tribal-state compacts (or equivalent memoranda of understanding) entered into under the IGRA.

15.     The IGRA was enacted in 1988 in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that states lack regulatory authority over gaming on Indian lands.  *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014).  The stated purpose of the IGRA is to provide a statutory basis for establishment and regulation of gaming operations conducted by Indian tribes.  25 U.S.C. § 2702.

16.     Among other requirements, the IGRA authorizes tribal gaming only pursuant to a compact the tribe has negotiated with the surrounding state and which has been approved by the U.S. Secretary of the Interior.  25 U.S.C. § 2710(d)(1)(C), (d)(3)(B).  The IGRA contains provisions relating to the compact negotiation and approval process.  *See* 25 U.S.C. § 2710(d).

17.     The IGRA authorizes tribal gaming only "on Indian lands."  25 U.S.C. § 2710(d)(1).  The term "Indian lands" is defined by the IGRA as "(A) all lands within the limits

of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual[,] or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4).

18.    The IGRA's authorization of gaming only "on Indian lands" means that a tribe cannot simply purchase land and then provide IGRA-authorized gaming on that land. The Indian Reorganization Act and its implementing regulations promulgated by the Secretary of the Interior impose requirements and limitations on the ability of the Secretary to take land into trust for the benefit of Indian tribes or for lands otherwise to become "Indian lands." *See* 25 U.S.C. § 465; 25 C.F.R. pt. 151. Moreover, the IGRA itself generally prohibits gaming on lands acquired after October 17, 1988, subject to limited exceptions. 25 U.S.C. § 2719(a), (b).

19.    As described below, the Connecticut Act establishes a process by which the Preferred Tribes, and only the Preferred Tribes, may seek to develop a commercial casino outside of Indian lands. Because this commercial casino would exist off of Indian lands, it would not be authorized by the IGRA.

20.    The Act also contemplates that the Preferred Tribes would enter into a development agreement to be approved by the Connecticut legislature, not a compact under the IGRA.

21.    The Act is a unilateral action by Connecticut to allow the Preferred Tribes to establish a commercial casino off of Indian lands and wholly separate from the regulatory structure of the IGRA.

B.    **Special Act 15-7**

22.    Special Act 15-7, "An Act Concerning Gaming," was originally introduced in the Connecticut General Assembly as Senate Bill 1090 on March 11, 2015. As originally drafted,

S.B. 1090 would have authorized the Commissioner of the Department of Consumer Protection to "issue up to three casino gaming facility licenses to the Mashantucket Pequot Tribe and the Mohegan Tribe of Indians of Connecticut to authorize such tribes to act jointly to establish and operate up to three casino gaming facilities in the state." S.B. 1090, § 2(a)(2). The Department of Consumer Protection would have been responsible for regulating and overseeing operation of these casino gaming facilities. S.B. 1090, § 2(i)(2).

23.    The Attorney General for the State of Connecticut, however, raised concerns about the legality of proposed S.B. 1090 in a letter to state legislators dated April 15, 2015. The letter first observes that S.B. 1090 would authorize gaming by the two tribes "outside [of] their respective reservations." The letter then focuses on the risk that S.B. 1090 might constitute an unlawful amendment to the Preferred Tribes' existing IGRA compacts with the State. The letter concludes that S.B. 1090 might be vulnerable to challenges under the Equal Protection Clause and the dormant Commerce Clause of the federal constitution.

24.    On May 20, 2015, the Connecticut General Assembly amended S.B. 1090, and that version of the bill was signed into law by the Governor on June 19, 2015, as Special Act No. 15-7 (the "Act"). The Act authorizes the Preferred Tribes to negotiate and enter into a casino development agreement with a municipality and contemplates subsequent state legislation approving such an agreement. *See* Luther Turmelle, *Connecticut's Joint Casino Venture Moves Forward*, The Middletown Press (Oct. 1, 2015) ("Earlier this year . . . Connecticut lawmakers approved legislation that created a process to allow for the building of a new gaming facility.").[1]

25.    The Act authorizes the Secretary of the State to register a "tribal business entity," defined as an entity "owned exclusively by both the Mashantucket Pequot Tribe and the

---

[1] *Available at* http://www.middletownpress.com/business/20151001/connecticuts-joint-casino-venture-moves-forward.

Mohegan Tribe of Indians of Connecticut." Act § 1(a)(1). Only one tribal business entity may be formed. Act § 1(f).

26.     The Act authorizes the tribal business entity to "issue a request for proposals to municipalities regarding the establishment of a possible casino gaming facility in a municipality." Act § 1(b). The tribal business entity "shall submit any such request for proposals to the Department of Consumer protection." Act § 1(b). The Act makes the Department an active partner in the Tribes' development process by mandating that the Department "shall post such request for proposals on its Internet web site." Act § 1(b). Once such a request for proposals is issued, the tribal business entity must submit monthly status reports to the Connecticut General Assembly. Act § 1(e).

27.     The Act authorizes "[a]ny municipality" to respond to such request for proposals. Act § 1(c).

28.     The Act further provides that "[t]he tribal business entity may enter into a development agreement with a municipality regarding the establishment of a possible casino gaming facility in such municipality." Act § 1(c). Municipalities are not authorized to negotiate or enter into such agreements with anyone other than the Preferred Tribes. *See Wellswood Columbia, LLC v. Town of Hebron*, 992 A.2d 1120, 1128 (Conn. 2010) ("It is well settled that a municipality, as a creation of the state, has no inherent powers of its own, and has only those powers expressly granted to it by the state or that are necessary for it to discharge its duties and carry out its purposes." (citations and quotation marks omitted)).

29.     As confirmed by the chairman of the Mashantucket Pequot Tribe, the Preferred Tribes' "ultimate goal is to go back to the legislature in February [2016, when the next legislative session begins,] having completed an RFP [request for proposals] and having

nominated a host community."  Brian Hallenbeck, *Tribal Chairman Bullish on Third State Casino*, The Day (July 16, 2015).[2]

30.     All benefits of the Act – including formation of the tribal business entity, issuance and dissemination of a request for proposals, and negotiation of a development agreement – are reserved exclusively for the Preferred Tribes.

31.     The Act thus provides the State of Connecticut's imprimatur for the Preferred Tribes' casino development efforts and signals, at a minimum, that the State plans to consider the Preferred Tribes' casino development proposal.  The State's authorization makes it more likely that third parties – such as municipalities, investors, and others integral to the casino development process – will support the Preferred Tribes' efforts to develop a casino and participate in the Preferred Tribes' casino development activities.

32.     By contrast, without any such enabling legislation or the backing of the State, all other entities that want to develop a casino in Connecticut are, at best, put at a competitive disadvantage because Connecticut law forbids operation of commercial casino gaming facilities. *See, e.g.*, Conn. Gen. Stat. §§ 53-278b(b), 53-278a(3).  Given this restriction and the absence of a legal pathway to owning or operating a commercial casino in Connecticut, municipalities and investors have no incentive to consider a development proposal by MGM or any entity other than the Preferred Tribes, rendering any effort by MGM or similarly situated entities to develop a casino in the State futile.

33.     When the Act was passed, the Preferred Tribes made plain that they view the Act as a benefit by opening the door for them to develop a casino.  Upon passage of the Act, the Preferred Tribes issued a joint statement indicating that they "hope[d]" the "legislation would be

---

[2] *Available at* http://www.theday.com/article/20150716/NWS01/150719401.

signed by the Governor" because it "will begin a process by the Mohegan and Mashantucket Pequot Tribes to invest millions to identify the best site for a satellite gaming facility in north central Connecticut, and to work with state and federal officials to ensure the state and our two Tribal governments are legally protected." *Lawmakers Approve Multi-Step Gaming Expansion Strategy*, Hartford Bus. J. (May 29, 2015).[3] Indeed, the Preferred Tribes celebrated the Act's passage and "thank[ed] the members of the state Senate for supporting S.B. 1090 and moving this vital legislation forward." *Conn. Senate Passes Weakened Bill to Up Tribal Gaming*, Law360 (May 21, 2015).

34.     The Act's benefits for the Preferred Tribes have been summarized by the Office of Legislative Research, which is charged by statute with "preparing bill analyses and summaries." Conn. Gen. Stat. § 2-71c. The Office's analysis of S.B. 1090, as amended in its final form, summarizes the bill as "creat[ing] a process for the possible establishment of an off-reservation casino in the state.  It allows the Mohegans and Mashantucket Pequots, through a business entity owned exclusively by them, to issue a request for proposals (RFP) to possibly establish an off-reservation casino. . . .  The bill allows the tribal business entity to enter into a development agreement with a municipality to possibly establish the casino."   OLR Bill Analysis, SB 1090.[4]

35.     Media reports likewise describe the Act as conferring benefits on the Preferred Tribes.  They describe the Act as "giving the Mohegans and Mashantucket Pequots . . . exclusive rights to build a casino on private land," Mikaela Porter, *Clock Ticking As Enfield Starts Talking Casinos in Earnest*, Hartford Courant (Sept. 28, 2015),[5] and they note that "the two tribes sought

---

[3] *Available at* http://www.hartfordbusiness.com/article/20150529/NEWS01/150529927.

[4] *Available at* https://www.cga.ct.gov/2015/BA/2015SB-01090-R01-BA.htm.

[5] *Available at* http://www.courant.com/news/connecticut/hc-northern-connecticut-casinos-20150928-story.html.

and obtained approval from the Connecticut General Assembly to [develop] a jointly-operated casino," *E. Hartford Approves Casino Site*, Hartford Bus. J. (Sept. 24, 2015)[6]; *see also* Kenneth R. Gosselin, *Tribes' Hurried Search for Hartford-Area Casino Site: Broad Statements, Few Details*, Hartford Courant (Oct. 1, 2015) ("Earlier this year, the state legislature approved having the Mohegans and Mashantucket Pequots search for a third casino site in Connecticut.").[7]

36. The Act does not establish any competitive procedure or provide any opportunity for anyone or any entity other than the Preferred Tribes to take steps to develop a casino in Connecticut.

37. The Act contains no provision that the request for proposals or development agreement be limited to proposed casino development "on Indian lands" as defined by the IGRA. To the contrary, the Act's requirement that the Preferred Tribes reach an agreement with a local municipality regarding development of a casino makes plain that the proposed commercial casino would not be located on Indian lands.

38. The Act contains a non-severability provision, which provides that "[i]f a final judgment of any court of competent jurisdiction holds any provision of this section invalid, unlawful or unconstitutional, the remaining provisions of this section shall be inoperative and have no effect." Act § 1(g).

39. The Act's intent, as perceived by the public and stakeholders in the casino development process, is that "there's no question about who would develop a new casino" because "only the Mashantucket Pequot and Mohegan tribal nations" are authorized to negotiate and sign a casino development agreement. Susan Haigh, *Latest Casino Bill Differs From 1995*

---

[6] *Available at* http://www.hartfordbusiness.com/article/20150924/NEWS01/150929944/e-hartford-approves-casino-site.

[7] *Available at* http://www.courant.com/real-estate/property-line/hc-mohegan-sun-foxwoods-launch-search-20151001-story.html.

*Bridgeport Effort*, New Haven Register (Apr. 18, 2015) (adding that the legislation reflects "partiality toward the state's two federally recognized tribes").[8]

40.     In passing the Act, Connecticut legislators explained that it is designed to benefit the Preferred Tribes and to protect Connecticut jobs and revenue.  For example, State Senator Cathy Osten told the press that "[e]ssentially, there is nothing that we should not do to support these two business entities that have helped the state of Connecticut."  Christopher Keating, *Senate OKs Casino Bill, But Plots a Cautious Path*, Hartford Courant (May 20, 2015).[9] Likewise, Representative Stephen Dargan, House Chair of the Public Safety Committee, expressed that Connecticut is "serious about protecting our market share" from out-of-state competition, Kenneth R. Gosselin, *Threat By MGM Boss Launches Casino Border War; Tribes Fire Back*, Hartford Courant (July 16, 2015);[10] Representative Dargan has also stated that "the new law that was enacted is about protecting and expanding jobs right here in Connecticut.  I believe we can better achieve that goal by working with the Mohegan and Pequot Tribes who have agreed to partner with the state."  Dan Glaun, *MGM Lawsuit: Future of Connecticut's Gaming May Depend on Interpretation of Law*, Mass Live (Sept. 24, 2015).[11]  Rodney Butler, chairman of the Mashantucket Pequot Tribal Counsel, has likewise explained that "lawmakers

---

[8] *Available at* http://www.nhregister.com/apps/pbcs.dll/article?avis=NH&date=20150418&category= NEWS&lopenr= 150419457&Ref=AR&profile=1030040.

[9] *Available at* http://www.courant.com/politics/hc-connecticut-casino-ag-obstacle-0521-20150520- story.html#page=1.

[10] *Available at* http://www.courant.com/business/hc-mgm-connecticut-casino-border-war-20150715-story.html.

[11] *Available at* http://www.masslive.com/mgm_springfield/index.ssf/2015/09/mgm_lawsuit_future_ of_connecti.html.

have embraced the project from a legislative perspective." Luther Turmelle, *Connecticut's Joint Casino Venture Moves Forward*, The Middletown Press (Oct. 1, 2015).[12]

41. Consistent with these views, a spokesman for Governor Malloy explained in connection with the Act that "[t]he General Assembly and the governor just put forward legislation focused on protecting the interests of the state of Connecticut and the jobs that go along with the casino industry." Kenneth R. Gosselin, *Threat By MGM Boss Launches Casino Border War; Tribes Fire Back*, Hartford Courant (July 16, 2015).[13]

42. Representatives of the Preferred Tribes also admitted the protectionist nature of the Act, asserting that it is designed to prevent the "siphoning [of] revenues from Connecticut to benefit a Las Vegas company" – i.e., MGMRI, which is developing a casino in Springfield, Massachusetts – and "[t]hat's why the tribes, the legislature, and the governor have committed to developing a solution that protects Connecticut," in the form of the Act. *Id.*

### C.   MGM's Interest in Casino Gaming and the Act's Exclusion of MGM from Connecticut

43. In addition to the 15 wholly-owned casino resorts MGMRI operates in the United States, MGMRI has two domestic casino developments underway: MGM National Harbor, in Prince George's County, Maryland, and MGM Springfield, in Springfield, Massachusetts. The licenses to develop both of these casinos were issued in competitive bidding processes.

44. MGMRI does not have any casino gaming operations in Connecticut.

45. MGM regularly evaluates casino expansion and acquisition opportunities. MGM stays apprised of proposals to expand or authorize gaming introduced in state legislatures and assesses whether it would be commercially desirable to compete for a gaming license in such

---

[12] *Available at* http://www.middletownpress.com/business/20151001/connecticuts-joint-casino-venture-moves-forward.

[13] *Available at* http://www.courant.com/business/hc-mgm-connecticut-casino-border-war-20150715-story.html.

states based on factors such as revenue expected to be generated by such facilities.  MGM has recently evaluated potential opportunities in Florida, Georgia, Illinois, Maryland, Massachusetts, and New York, among other states.  It is this process that led MGM and MGMRI to compete for and receive the licenses to develop MGM National Harbor and MGM Springfield.

46.   MGM has analyzed the Connecticut gaming market and is familiar with the economics of a potential casino development in the State.

47.   MGM has also completed a preliminary feasibility study, which analyzes the viability of a potential casino development in Connecticut located outside the 50-mile radius restriction discussed below and reaches the preliminary conclusion that such a development is both feasible and desirable for MGM and MGMRI.

48.   MGM has the resources and expertise to prepare a competitive request for proposals for a Connecticut casino and to evaluate the responses.

49.   Establishment by MGM of a Connecticut casino would not conflict with development of a casino in Springfield, Massachusetts, located approximately ten miles from the Connecticut border, by another affiliate of MGMRI.  There are many potential casino sites in Connecticut beyond the 50-mile radius restriction in the state license governing MGM Springfield.  Bridgeport, which was considered in the 1990s as the site for a development of a casino by Mirage (before it was acquired by MGMRI) and has recently been suggested as a possible casino location, is one of these potential sites.  *See, e.g.*, Rob Sullivan, *Talk of a New Casino Resurfaces in Bridgeport*, Bridgeport Daily Voice (Nov. 25, 2014); David Collins, *How About a Bridgeport Casino Too?* The Day (Nov. 14, 2014).[14]  Other sites outside the 50-mile radius are equally viable.

---

[14] *Available at* http://www.theday.com/article/20141114/NWS05/311149944.

50.     MGM is also not as a practical or economic matter precluded from developing a casino in Connecticut simply because MGM Springfield is located near Connecticut.  MGM and other casino developers often employ a "two-stop strategy," pursuant to which a single owner will own two or more casinos in relative proximity to one another, with the goal of capturing a greater share of the market than a single casino would be able to capture alone.  MGMRI has employed this strategy in Las Vegas and in Mississippi, and MGMRI's Mlife player loyalty program supports this strategy by encouraging players to visit multiple MGMRI properties.  MGM's preliminary feasibility study indicates that having casinos both in Springfield and Connecticut would be commercially attractive to MGM and MGMRI.

51.     The two-stop strategy is common in the casino industry.  The Mohegan Tribes of Indians of Connecticut attempted in 2014 to move forward with a two-stop strategy in the region by bidding on a gaming license for a commercial casino in the greater Boston area, but was rejected in favor of another developer and has since intervened in a lawsuit in Massachusetts state court challenging issuance of that license.  The Mashantucket Pequot Tribe also pursued a two-stop strategy by submitting bids to develop casino gaming facilities in Massachusetts.

52.     Although the Act excludes MGM from registering a tribal business entity (and contains no provision permitting it to negotiate with municipalities), MGM attempted on July 22, 2015 to register the tribal business entity contemplated by the Act with the Secretary of the State of Connecticut.

53.     On July 23, 2015 MGM received a notice from the Secretary of the State of Connecticut that its registration was rejected for the following reason:

> THE BUSINESS ENTITY DESCRIPTION AT SECTION #2 DOES NOT COMPLY WITH CONNECTICUT LAW.  SECTION l(A)(l) OF SPECIAL ACT 15-7 DEFINES "TRIBAL BUSINESS ENTITY" AS A BUSINESS ENTITY REGISTERED WITH THE SECRETARY OF THE STATE TO DO BUSINESS

IN THE STATE AND OWNED EXCLUSIVELY BY BOTH THE
MASHANTUCKET PEQUOT TRIBE AND THE MOHEGAN TRIBE OF
INDIANS OF CONNECTICUT. YOU INDICATE IN THE COVER LETTER
YOU HAVE NO AFFILIATION WITH EITHER OF THESE TRIBES.

54.    MGM's rejected registration attempt demonstrates both its interest in competing

for a casino development opportunity in Connecticut as well as the discriminatory nature of the

Act.

55.    One month later, on August 24, 2015, at the request of the Preferred Tribes, the

Secretary of the State approved the formation of the tribal business entity, named "MMCT

Venture, LLC."

56.    The Preferred Tribes publicly announced the formation of the tribal business

entity at a ceremony on September 10, 2015, which was attended by Lieutenant Governor Nancy

Wyman who expressed support for the Preferred Tribes' efforts. The Preferred Tribes' press

release states that the Act "created a process for building a new gaming facility" and that

formation of the tribal business entity marked the "first step" toward such a casino.

57.    The Preferred Tribes "delivered a copy of the[ir] request for proposals . . . to the

state Department of Consumer Protection" on September 30, 2015. Kenneth R. Gosselin,

*Tribes' Hurried Search for Hartford-Area Casino Site: Broad Statements, Few Details*, Hartford

Courant (Oct. 1, 2015).[15]

58.    The Department of Consumer Protection posted the Preferred Tribes' RFP on its

website later that day.[16]

59.    The RFP represents that it is issued "pursuant to" and "in accordance with" the

Act. The RFP further states that the Preferred Tribes are moving "forward on this joint venture

---

[15] *Available at* http://www.courant.com/real-estate/property-line/hc-mohegan-sun-foxwoods-launch-search-20151001-story.html.

[16] *Available at* http://www.ct.gov/dcp/lib/dcp/MMCT_Request_for_Proposal.pdf.

to protect the jobs, revenue and partnership we have enjoyed with the State of Connecticut for over twenty years."

60.     The RFP confirms that the Preferred Tribes intend to move forward expeditiously with the casino development process.  The RFP establishes a November 6 deadline for proposals from municipalities and states that proposals "will be evaluated immediately thereafter" and that "MMCT expects to select the Municipality and the Property" for the proposed casino "by December 15, 2015.  Thereafter, MMCT intends to negotiate and enter into a development agreement with the selected Municipality and option to purchase or  lease the selected Property." The RFP also notes that the Preferred Tribes wish to partner with a municipality that can help "complet[e] a project quickly" and are "interested in identifying a Municipality that wishes to become home to the facility that *will* provide significant and lasting benefit to the residents of the community." (Emphasis added).

61.     At a press conference held October 1, 2015, the Preferred Tribes publicly unveiled the RFP and underscored that they "are in a rush to build a . . . casino."  Kenneth R. Gosselin, *Tribes' Hurried Search for Hartford-Area Casino Site: Broad Statements, Few Details*, Hartford Courant (Oct. 1, 2015).[17]  Representatives for the Preferred Tribes explained that the "timetable" for the RFP process is "incredibly aggressive," Ryan Blessing, *Tribes Release Request for Proposals for Third Casino*, Norwich Bulletin (Oct. 1, 2015),[18] that the "effort to develop another casino in Connecticut . . . remains on the fast track," Luther Turmelle, *Connecticut's Joint Casino Venture Moves Forward*, The Middletown Press (Oct. 1, 2015),[19] and

---

[17] *Available at* http://www.courant.com/real-estate/property-line/hc-mohegan-sun-foxwoods-launch-search-20151001-story.html.

[18] *Available at* http://www.norwichbulletin.com/article/20151001/NEWS/151009968.

[19] *Available at* http://www.middletownpress.com/business/20151001/connecticuts-joint-casino-venture-moves-forward.

that the Preferred Tribes are seeking a site they can "develop in the shortest amount of time," Ryan Blessing, *Tribes Release Request for Proposals for Third Casino*, Norwich Bulletin (Oct. 1, 2015).[20]

62.     In response, municipalities in Connecticut have taken steps to convince the Preferred Tribes to engage in discussions with them about a casino development agreement.  For instance, East Hartford's Planning and Zoning Commission approved a proposed casino site on September 23.  *E. Hartford Approves Casino Site*, Hartford Bus. J. (Sept. 24, 2015).[21]  Other towns, including Enfield, have also engaged in discussions about hosting a casino site for the Preferred Tribes.

63.     These actions by the municipalities are directly authorized by Special Act 15-7, which creates an incentive for municipalities to engage in such actions by fostering an understanding that the State is "partner[ing]" with the Preferred Tribes and that the Preferred Tribes' RFP is "backed by the legislature and Gov. Dannel P. Malloy."  Dan Glaun, *MGM Lawsuit: Future of Connecticut's Gaming May Depend on Interpretation of Law*, MassLive (Sept. 24, 2015).[22]

64.     The Preferred Tribes intend to enter into an agreement with a municipality and submit it to the legislature for approval at the start of the next scheduled legislative session in February 2016.  Brian Hallenbeck, *Tribal Chairman Bullish on Third State Casino*, The Day (July 16, 2015).

---

[20] *Available at* http://www.norwichbulletin.com/article/20151001/NEWS/151009968.

[21] *Available at* http://www.hartfordbusiness.com/article/20150924/NEWS01/150929944/e-hartford-approves-casino-site.

[22] *Available at* http://www.masslive.com/mgm_springfield/index.ssf/2015/09/mgm_lawsuit_future_of_connecti.html.

65.     The Mashantucket Pequot chairman has stated that a new casino "could be up and running six to nine months after approval." *Id.*

66.     The Act contemplates a legislative vote on any agreement entered into between the Preferred Tribes and a municipality for development of another casino in Connecticut. The plain intent of the Act is that an agreement be reached between the Preferred Tribes and a municipality and then approved or rejected, with no opportunity for MGM or any other entities to compete. In view of the Act's terms and the public statements of Connecticut officials quoted above, it is unlikely that subsequent legislation would allow MGM or other entities to compete for a Connecticut casino. Further, even if MGM and others were allowed to compete for a Connecticut casino, they would be at a competitive disadvantage given that the Preferred Tribes would already have reached an agreement with a municipality and have made other preparations to gain a preferred market position. *See* Michelle Liu & Jacob Stern, *Connecticut Tribes Formalize Casino Partnership*, Yale Daily News (Sept. 15, 2015) (Act has "permitted the tribes to begin galvanizing local support for the project").

67.     MGM, therefore, has suffered, and will continue to suffer, irreparable harm, for which MGM has no adequate remedy at law, as a result of the Act's exclusive, no-bid process, which allows only the Preferred Tribes to move forward with developing a casino in Connecticut.

## CLAIM FOR RELIEF

### COUNT ONE
### (Violation of the Federal Equal Protection Clause – Racial and/or National Origin Discrimination)

68.     Plaintiff re-alleges and incorporates ¶¶ 1-67 of the Complaint as if set forth fully herein.

69.     The Fourteenth Amendment to the Constitution of the United States provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

70.     MGM is ready, willing, and able to compete for the opportunity to develop a casino gaming facility in Connecticut, but is excluded from doing so by the Act.

71.     The Act is subject to strict scrutiny because by creating an exclusive race and/or national origin-based set-aside for the two Preferred Tribes, it by definition treats potential casino developers differently on the basis of race and/or national origin.

72.     State laws that establish preferences for tribes not authorized by federal law are subject to strict scrutiny.  Although the federal government has authority to "enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive," states may not enact such legislation unless authorized to do so by federal law.  *Washington v. Confederated Bands & Tribes of the Yakama Indian Nation*, 439 U.S. 463, 500-01 (1979).

73.     The Act is not authorized by the IGRA because it creates a process wholly separate from the IGRA and contemplates development of casino gaming outside of Indian lands, and no other federal law authorizes the Act.  Accordingly, the Act is subject to strict scrutiny as a classification on the basis of race and/or national origin.

74.     The Equal Protection Clause prohibits classifications on the basis of race or national origin unless they are narrowly tailored to advance a compelling government interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995); *Clark v. Jeter*, 486 U.S. 456 (1988).

75.     The Act serves no compelling government interest that could justify the discriminatory treatment at issue.  Even if such an interest did exist, the Act's exclusive, no-bid set aside for the Preferred Tribes is not narrowly tailored to such an interest.

76.     The Act accordingly violates the Equal Protection Clause.

## COUNT TWO
### (Violation of the Federal Equal Protection Clause – No Rational Basis)

77.    Plaintiff re-alleges and incorporates ¶¶ 1-76 of the Complaint as if set forth fully herein.

78.    The Act also violates the Equal Protection Clause because the Act lacks a rational basis.

79.    Even where only rational basis review applies under the Equal Protection Clause, a state law must still be reasonably related to "some legitimate governmental purpose" to satisfy the Constitution's guarantee of equal protection. *Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012).

80.    Here, the only plausible basis for the distinctions drawn in favor of the Preferred Tribes in the Act is to benefit economically and otherwise protect the Preferred Tribes.

81.    Economic protectionism is not a legitimate government interest, and so statutes whose sole rationale is economic protectionism violate the Equal Protection Clause.

82.    The Act accordingly violates the Equal Protection Clause for this additional reason.

## COUNT THREE
### (Violation of the Federal Dormant Commerce Clause –
### Facial Discrimination Against Interstate Commerce)

83.    Plaintiff re-alleges and incorporates ¶¶ 1-82 of the Complaint as if set forth fully herein.

84.    The Commerce Clause reserves to Congress the authority "[t]o regulate Commerce . . . among the several States." U.S. Const. Art. I, § 8, cl. 3. The Supreme Court has interpreted the Clause as prohibiting states from engaging in "economic protectionism[,] that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state

competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988)).

85.     The Preferred Tribes are located within the state of Connecticut, whereas MGM is a Nevada limited liability company with its principal place of business in Nevada.

86.     The Act on its face discriminates against interstate commerce because it prohibits all out-of-state entities, including MGM, from competing to develop a Connecticut casino and reserves those development opportunities to the Connecticut-based Preferred Tribes.

87.     "Discrimination against interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the [state] can demonstrate, under rigorous security, that it has no other means to advance a legitimate local interest." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994).

88.     Connecticut cannot make any showing that the Act is the only means available to advance a legitimate local interest.  The only local interest served by the Act's discrimination against out-of-state competitors is ensuring additional revenue flow to the Preferred Tribes.  A casino developed by an out-of-state entity would provide the same employment, tax, and other benefits as an equivalent casino developed by the Preferred Tribes.  Thus the only local benefit of the Act would be the additional revenues that the Connecticut-based Preferred Tribes would gain by virtue of owning and operating such a casino.

89.     The dormant Commerce Clause "abhors" "[s]imple economic protectionism," which is not a legitimate local interest. *Dep't of Revenue of Ky.*, 553 U.S. at 341.  Courts have struck down statutes restricting issuance of gaming licenses to in-state entities because such statutes facially discriminate against out-of-state entities in violation of the dormant Commerce Clause.  *See Gulch Gaming, Inc. v. South Dakota*, 781 F. Supp. 621, 629 (D.S.D. 1991)

(requirement in gaming statute that corporation be majority-owned by in-state owners violates dormant Commerce Clause); *Dep't of Revenue v. There to Care, Inc.*, 638 N.E.2d 871, 874 (Ind. Ct. App. 1994) (requirement that corporation be in existence in Indiana for at least five years before it may operate certain gaming facilities "discriminates 'on its face' against interstate commerce").

90.    The Act is not saved because in-state entities other than the Preferred Tribes are also excluded from competing to develop a Connecticut casino. *Carbone*, 511 U.S. at 391.

91.    The Act accordingly violates the dormant Commerce Clause.

### COUNT FOUR
### (Violation of the Dormant Commerce Clause –
### Substantial Burden on Interstate Commerce)

92.    Plaintiff re-alleges and incorporates ¶¶ 1-91 of the Complaint as if set forth fully herein.

93.    The Act also violates the dormant Commerce Clause because it imposes a burden on interstate commerce disproportionate to any local benefit.

94.    Where a statute does not discriminate against interstate commerce on its face, it is nevertheless invalid if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Dep't of Revenue of Ky.*, 553 U.S. at 338-39 (alteration in original) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 134, 142 (1970)).

95.    The burden of excluding all out-of-state entities from competing to develop a Connecticut casino is excessive in comparison to the sole purported in-state benefit of having additional revenue flow to the in-state Preferred Tribes.

96.    The Act's burdensome nature is illustrated by the fact that if each state were permitted to adopt legislation similar to the Act, each would be in effect a separate fiefdom,

where only in-state entities would be permitted to develop and operate casinos. Such a result is squarely contrary to the purpose of the dormant Commerce Clause, which is to prevent "economic Balkanization" among the states. *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325-26 (1979)).

97.     The Act accordingly violates the dormant Commerce Clause for the additional reason that it imposes an unjustified excessive burden on interstate commerce.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to enter judgment in its favor and against Defendants and to:

A.     Declare that the Act violates the federal Equal Protection Clause and the dormant Commerce Clause, and is thus invalid, null, and void in its entirety, or at a minimum to the extent it:

    1.     Authorizes only the Preferred Tribes to:

        a)     Register a tribal business entity with the Secretary of the State of Connecticut;

        b)     Issue a request for proposals and have such request disseminated by the Connecticut Department of Consumer Protection;

        c)     Negotiate with municipalities regarding development of a casino gaming facility; and

        d)     Enter into an agreement for development of a casino gaming facility with a municipality.

    2.     Authorizes the Secretary of the State of Connecticut, the Connecticut Department of Consumer Protection, and municipalities in Connecticut to engage in the foregoing actions only with the Preferred Tribes.

B.     Declare that Defendant Merrill has violated the federal Equal Protection Clause and the dormant Commerce Clause by registering the tribal business entity

pursuant to the Act and issue an injunction directing Defendant Merrill to revoke that registration.

C.  Declare that Defendant Harris has violated the federal Equal Protection Clause and the dormant Commerce Clause by posting the Preferred Tribes' RFP on the Department of Consumer Protection website pursuant to the Act, and issue an injunction directing Defendant Harris to remove that RFP from the Department's website.

D.  Declare that any casino development agreement entered into between any municipality and the Preferred Tribes (or their joint venture, MMCT) is the product of an unconstitutional process and violates the federal Equal Protection Clause and the dormant Commerce Clause and is thus invalid, null, and void in its entirety.

E.  Declare that any legislation approving any casino development agreement or otherwise authorizing the Preferred Tribes (or MMCT) to operate a casino gaming facility developed under the auspices of the Act is the product of an unconstitutional process and violates the federal Equal Protection Clause and the Dormant Commerce Clause, and is thus invalid, null and void in its entirety.

F.  Preliminarily and permanently enjoin Defendants from enforcing, or exercising any authority under, the unlawful provisions of the Act; and

G.  Award any other relief, including reasonable attorneys' fees and expenses, *see, e.g.*, 42 U.S.C. § 1988, that the Court deems just and proper.

October 5, 2015

Respectfully submitted,

James K. Robertson Jr.
Ct#05301
Carmody Torrance Sandak & Hennessey LLP
50 Leavenworth Street
Waterbury, CT 06721
Tel: 203.575.2636
Fax: 203.575.2600
jrobertson@carmodylaw.com

Neil K. Roman, phv07712
Clea Liquard, phv07714
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: 212-841-1221
Fax: 212-841-1010
nroman@cov.com

Edward H. Rippey, phv07737
Kevin King, phv07715
Thomas R. Brugato, phv07713
Covington & Burling LLP
One CityCenter
850 Tenth St., NW
Washington, DC 20001
Tel: 202-662-5171
Fax: 202-778-5171
erippey@cov.com

*Counsel for Plaintiff*

## CERTIFICATION OF SERVICE

I hereby certify that, on October 5, 2015, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties y operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

James K. Robertson (ct# 05301)