**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MGM RESORTS INTERNATIONAL GLOBAL GAMING DEVELOPMENT, LLC | ) ) ) | |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) ) | |
| DANNEL P. MALLOY, in his official capacity as Governor of Connecticut, | ) ) ) | Case No. 3:15-cv-1182-AWT |
| DENISE W. MERRILL, in her official capacity as Connecticut Secretary of the State, and | ) ) ) ) | |
| JONATHAN A. HARRIS, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection | ) ) ) ) | |
| *Defendants*. | ) ) ) | |

## MGM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF THE CASE...................................................................................... 4

      A.     Tribal Gaming In Connecticut ............................................................. 4

      B.     Special Act 15-7 ...................................................................................... 5

      C.     MGM's Interest In Casino Gaming In Connecticut............................ 7

      D.     The Casino Development Efforts Of The Preferred Tribes And
            Connecticut Municipalities Under The Act ...................................... 8

STANDARD OF REVIEW ......................................................................................... 10

ARGUMENT ................................................................................................................ 11

I.      MGM HAS ARTICLE III STANDING. ...................................................... 11

      A.     The Act Injures MGM By Denying It The Opportunity To Compete On
            Equal Footing In Planning And Developing A Connecticut Casino. ................. 12

            1.     The Act Excludes MGM from the Only Legal Pathway to
                  Development of a Commercial Casino. .................................................... 15

            2.     The Act Prevents MGM From Competing on Equal Footing in
                  Executing a Development Agreement. .................................................... 19

      B.     MGM's Injury Is Present And Ongoing. ............................................ 25

            1.     The Act's Contemplation of Additional Legislation Does Not
                  Make MGM's Injury "Speculative."........................................................ 25

            2.     The 50-mile Radius Restriction Is Not an Independent Bar to
                  MGM's Ability to Compete for and Operate a Casino in
                  Connecticut. ............................................................................................ 27

      C.     The Act Causes MGM Injury That Will Be Redressed By A Declaration
            That The Act Is Unconstitutional........................................................ 30

      D.     Neither Abstention Nor Certification Is Warranted............................. 31

II.     MGM'S CLAIMS ARE CONSTITUTIONALLY AND PRUDENTIALLY RIPE. ....... 33

i

A.   MGM's Claims Are Constitutionally Ripe. ........................................................... 34

B.   Assuming Prudential Ripeness Is Required, MGM's Claims Are
Prudentially Ripe. ................................................................................................ 34

CONCLUSION ................................................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995)...........................................................................................14, 22

*Alliance For Clean Coal v. Bayh,*
888 F. Supp. 924 (S.D. Ind.), *aff'd*, 72 F.3d 556 (7th Cir. 1995) ...........................13

*Alliance for Clean Coal v. Miller,*
44 F.3d 591 (7th Cir. 1995) ...................................................................... *passim*

*Am. Inst. of Certified Pub. Accountants v. IRS,*
804 F.3d 1193 (D.C. Cir. 2015) ........................................................................21

*Am. Motorists Ins. Co. v. United Furnace Co.,*
876 F.2d 293 (2d Cir. 1989)...........................................................................11, 33

*Am. Promotional Events, Inc. v. Blumenthal,*
937 A.2d 1184 (Conn. 2008) ............................................................................16

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,*
659 F.3d 13 (D.C. Cir. 2011) ...........................................................................12

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
671 F.3d 140 (2d Cir. 2011)..............................................................................12

*Baur v. Veneman,*
352 F.3d 625 (2d Cir. 2003)......................................................................10, 12, 24

*Blanchette v. Conn. Gen. Ins. Corps.,*
419 U.S. 102 (1974)........................................................................................33

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.,*
462 F.3d 219 (2d Cir. 2006), *abrogated on other grounds by Bond v. United
States*, 131 S. Ct. 2355 (2011) ........................................................................34

*Cannady v. Valentin,*
768 F.2d 501 (2d Cir. 1985)..............................................................................35

*City of New York v. Mickalis Pawn Shop, LLC,*
645 F.3d 114 (2d Cir. 2011)..............................................................................31

*Clinton v. City of New York,*
524 U.S. 417 (1998)........................................................................................22

iii

*In re Coleman*,
    560 F.3d 1000 (9th Cir. 2009) ..............................................................................35

*Colorado River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976)......................................................................................32, 36

*Comer v. Cisneros*,
    37 F.3d 775 (2d Cir. 1994).......................................................................13, 19, 21

*Cortlandt Street Recovery Corp. v. Hellas Telecomms., S.à.r.l,*
    790 F.3d 411 (2d Cir. 2015)......................................................................10, 12, 24

*Cotto v. United Techs. Corp.*,
    738 A.2d 623 (Conn. 1999) ................................................................................17

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)...........................................................................................27

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)...........................................................................3, 24

*Dorman v. Satti*,
    862 F.2d 432 (2d Cir. 1988)...............................................................................33

*Dresser-Rand Co. v. Ingersoll Rand Co.*,
    No. 14-Civ-7222 (KPF), 2015 WL 4254033 (S.D.N.Y. July 14, 2015)................................35

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)...........................................................................................17

*Fulani v. League of Women Voters Educ. Fund*,
    882 F.2d 621 (2d Cir. 1989)...............................................................................23

*Heckler v. Mathews*,
    465 U.S. 728 (1984)...........................................................................................21

*Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*,
    438 F.3d 195 (2d Cir. 2006)...............................................................................30

*KG Urban Enters., LLC v. Patrick*,
    839 F. Supp. 2d 388 (D. Mass.), *aff'g standing and rev'g on other grounds by*
    693 F.3d 1 (1st Cir. 2012) .............................................................................13, 26, 36

*Kiser v. Reitz*,
    765 F.3d 601 (6th Cir. 2014) ..............................................................................35

*Krottner v. Starbucks Corp.*,
    628 F.3d 1139 (9th Cir. 2010) ............................................................................24

iv

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming
    Control Bd.*,
    172 F.3d 397 (6th Cir. 1999) ...............................................................13, 28, 29, 30

*Lewis v. United States*,
    445 U.S. 55 (1980) ......................................................................................16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).....................................................................................10

*McKithen v. Brown*,
    481 F.3d 89 (2d Cir. 2007).............................................................................9

*In Re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    725 F.3d 65 (2d Cir. 2013)........................................................................3, 12

*Morlan v. Universal Guar. Life Ins. Co.*,
    298 F.3d 609 (7th Cir. 2002) .......................................................................11

*N.Y. Civil Liberties Union v. Grandeau*,
    528 F.3d 122 (2d Cir. 2008)..........................................................................34

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2d Cir. 2013)...........................................................33, 34, 37

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,
    Fla.*,
    508 U.S. 656 (1993) ......................................................................... *passim*

*Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*,
    673 F.3d 84 (2d Cir. 2012)........................................................................31, 32

*Northstar Fin. Advisors Inc. v. Schwab Investments*,
    779 F.3d 1036 (9th Cir.), *cert. denied*, 136 S. Ct. 240 (2015)................................11

*Nutritional Health Alliance v. FDA*,
    318 F.3d 92 (2d Cir. 2003)..........................................................................17

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009).....................................................................................10

*Perille v. Raybestsos-Manhattan-Europe, Inc.*,
    494 A.2d 555 (Conn. 1985) .........................................................................15

*Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus*,
    60 F.3d 122 (2d Cir. 1995).............................................................................32

*Regents of Univ. of Cal. v. Bakke,*
    438 U.S. 265 (1978)...................................................................................................29

*Rockwell Int'l Corp. v. United States,*
    549 U.S. 457 (2007)...............................................................................................11, 25

*Ross v. Bank of Am., N.A. (USA),*
    524 F.3d 217 (2d Cir. 2008)............................................................................25, 34, 36

*S. Utah Wilderness Alliance v. Palma,*
    707 F.3d 1143 (10th Cir. 2013) ...............................................................................10

*Schutz v. Thorne,*
    415 F.3d 1128 (10th Cir. 2005) ...............................................................................13

*Shell Oil Co. v. Iowa Dep't of Revenue,*
    488 U.S. 19 (1988)...................................................................................................17

*Simmonds v. INS,*
    326 F.3d 351 (2d Cir. 2003)..........................................................................34, 36, 37

*Solomon v. Gilmore,*
    731 A.2d 280 (Conn. 1999) ....................................................................................18

*State v. Guckian,*
    605 A.2d 874 (Conn. App. Ct. 1992), *aff'd*, 627 A.2d 407 (Conn. 1993)..............16

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014)........................................................................................35, 36

*Tomlinson v. Tomlinson,*
    46 A.3d 112 (Conn. 2012) ......................................................................................17

*Travelers Ins. Co. v. 633 Third Assocs.,*
    973 F.2d 82 (2d Cir. 1992).................................................................................11, 25

*In re U.S. Catholic Conference,*
    824 F.2d 156 (2d Cir. 1987), *rev'd on other grounds*, 487 U.S. 72 (1988)............23

*United States v. Coluccio,*
    51 F.3d 337 (2d Cir. 1995)......................................................................................24

*Vermont Right to Life Comm., Inc. v. Sorrell,*
    221 F.3d 376 (2d Cir. 2000)....................................................................................32

*WC Capital Mgmt., LLC v. UBS Sec., LLC,*
    711 F.3d 322 (2d Cir. 2013)..................................................................................3, 12

*Wellsvood Columbia, LLC v. Town of Hebron*,
    992 A.2d 1120 (Conn. 2010) ................................................................15

**Statutes**

25 U.S.C. § 2702 ................................................................................4

25 U.S.C. § 2703(4) ............................................................................4

25 U.S.C. § 2710(d)(l) ........................................................................4

25 U.S.C. § 2710(d)(l)(C) ...................................................................4

25 U.S.C. § 2710(d)(3)(B) ..................................................................4

Conn. Gen. Stat. § 53-278a(3) ...........................................................18

Conn. Gen. Stat. § 53-278b(b) ...........................................................18

Connecticut Special Act 15-7 (June 19, 2015) ................................ *passim*

## INTRODUCTION

This lawsuit seeks to vindicate MGM's constitutional right to compete on a level playing field.  Connecticut Special Act 15-7 (the "Act") violates that fundamental guarantee by creating a casino-development process that excludes MGM at every step.  The Act stacks the deck by allowing the Mashantucket Pequot and Mohegan Indian Tribes (the "Preferred Tribes")—to the exclusion of all others—to form a special business entity, issue a request for proposals to municipalities through a state agency, and enter into an agreement with a municipality to establish a new commercial casino.  As MGM's Amended Complaint demonstrates, that exclusive, no-bid process violates the Equal Protection and Commerce Clauses of the United States Constitution.

Defendants do not defend the Act's discriminatory and exclusive framework.  Instead, their Motion to Dismiss ("Mot.") challenges MGM's suit on procedural grounds.  In particular, Defendants argue that MGM lacks standing to sue and that MGM's claims are not ripe for adjudication because the Act does not take the final step of authorizing the Preferred Tribes to operate a new commercial casino.

These arguments are fundamentally flawed because they fail to address the injury actually pleaded in MGM's Amended Complaint:  that the Act harms MGM by preventing it from competing on equal terms in planning and developing a new casino.  MGM undeniably has standing to assert that claim, and precedent leaves no doubt that it is both constitutionally and prudentially ripe for adjudication.

The U.S. Supreme Court has set forth the standing analysis:  Where, as here, "the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," the disadvantaged group's "inability to compete on an equal footing" constitutes an "injury in fact."  *Ne. Fla. Chapter of Associated Gen.*

1

*Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993).  Thus, "[t]o establish standing . . . a party challenging a set-aside program . . . need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis."  *Id.*

MGM's Amended Complaint does just that by alleging that MGM is ready, willing, and able to compete for the opportunity to develop a commercial casino in Connecticut, but is prevented from doing so on equal terms with the Preferred Tribes.  *See* Amended Complaint ("Am. Compl.") ¶ 6.  Indeed, the Act erects a barrier to fair competition, thereby injuring MGM, because it grants the Preferred Tribes advantages that MGM cannot obtain.  As an initial matter, the Act creates for the Preferred Tribes—and only the Preferred Tribes—a legal pathway to development of a new commercial casino.  Even if MGM were able to negotiate a development agreement outside that exclusive pathway, the Act places the State's imprimatur on the Preferred Tribes' development efforts and signals to municipalities, investors, and the public that the Tribes' proposal is the only one "backed by the legislature and Gov. Dannel P. Malloy."  Am. Compl. ¶ 63 (citation and quotation marks omitted).  The Act also provides the Preferred Tribes with a tangible benefit available to no one else by mandating that the Connecticut Department of Consumer Protection disseminate the Tribes' request for casino-development proposals on its website—the unavailability of this benefit *by itself* is sufficient to confer standing on MGM.

Defendants offer two responses, each of which contradicts the other, and neither of which withstands scrutiny.

Defendants initially assert that the benefits described above are not benefits at all, but rather are *burdens* imposed only on the Preferred Tribes.  This post-hoc rationalization is

contradicted by the Act's text, legislative history, and implementation[1]—all of which unequivocally show that the Act was intended to and does in fact reward the Tribes with important advantages in the casino-development process.  *See, e.g.*, Transcript of Senate Proceeding on Special Act 15-7 ("S. Tr.") (May 20, 2015) at 3 (The Preferred Tribes "[have] asked for our help.  . . .  This bill will allow the two tribes the ability to approach municipalities in the state through a request for a proposal process to locate a facility off the current Indian reservation.")  (statement of Sen. Larson).[2]

Defendants then flip-flop by admitting that the Act grants the Preferred Tribes exclusive benefits, while nevertheless insisting that these benefits are "outweigh[ed]" by "other restrictions and reporting requirements."  Mot. at 29.  Precedent is to the contrary:  Courts do not "weigh" a discriminatory law's supposed benefits against any burdens in determining whether a plaintiff has Article III standing.  *See e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) ("[T]hat an injury may be outweighed by other benefits . . . does not negate standing."). Significantly, Defendants concede that the Act "does not allow MGM to have its RFP 'disseminated' by the state through placement on the [Department of Consumer Protection]'s website," Mot. at 28; as noted, this acknowledgment is by itself sufficient to satisfy the "low threshold" required to establish standing,  *see, e.g.*,  *WC Capital Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 329 (2d Cir. 2013); *see also In Re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 105 (2d Cir. 2013) ("The injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice." (citation, quotation marks and alterations omitted)).

---

[1] All these facts are alleged in MGM's Amended Complaint, save for the statements of state legislators made during floor debates on the Act, which were not available at the time of filing.

[2] Excerpts of the House and Senate transcripts, containing the material quoted in this brief, are attached as Exhibits 1 (House) and 2 (Senate).

Defendants' ripeness argument is equally flawed.  Although Defendants argue that MGM's injury is speculative and contingent, that argument depends on the same mischaracterizations that doom Defendants' standing challenge.  MGM's claims are constitutionally ripe because the Act has *already* hindered (and continues to hinder) MGM's ability to compete for a commercial casino.  That extant and ongoing injury does not depend in any way on future action by the General Assembly.  Moreover, even assuming that prudential ripeness is a valid doctrine—an assumption undermined by recent Supreme Court precedent— this case is ripe for adjudication because it presents a purely legal question and because MGM is already suffering competitive hardship as a result of the Act's discriminatory scheme.

For all these reasons, Defendants' Motion to Dismiss should be denied.

## STATEMENT OF THE CASE

### A.    Tribal Gaming In Connecticut.

The federal Indian Gaming Regulatory Act ("IGRA") provides for establishment and regulation of tribal casinos.  25 U.S.C. § 2702.  Under IGRA, tribal gaming is authorized only pursuant to a compact entered into by a federally-recognized tribe and the surrounding state, which compact must also be approved by the Secretary of the Interior.  *Id.* §§ 2710(d)(l)(C), (d)(3)(B).    Importantly, IGRA authorizes tribal gaming only "on Indian lands." *Id.* §§ 2710(d)(1), 2703(4).

Because IGRA authorizes tribal gaming only "on Indian lands," an Indian tribe cannot purchase or lease property within a state for operation of an IGRA-authorized tribal casino, although a tribe could operate a *commercial* casino on non-Indian lands if it were willing to adhere to a state's competitive bidding procedures.  In that case, the tribe would be acting as any other entity in the marketplace and would not be entitled to special preference in the bidding process.

4

The Preferred Tribes are the only federally-recognized Indian tribes in Connecticut, and they operate IGRA-authorized casinos in the State.  Am. Compl.  ¶ 14.  Specifically, pursuant to tribal-state compacts (or equivalent memoranda of understanding) entered into under IGRA, the Mashantucket Pequot Tribe operates the Foxwoods casino on its reservation near Ledyard Center and the Mohegan Tribe operates the Mohegan Sun casino on its reservation near Uncasville.  *Id.*  The Preferred Tribes' casinos are the only casino gaming facilities in Connecticut.  *Id.*

As discussed below, Connecticut's Special Act 15-7 creates a process by which the Preferred Tribes may plan and develop a commercial casino on non-Indian land.  Because that casino would not be operated on Indian land, it is not authorized under IGRA.  *Id.* ¶ 19.

**B.      Special Act 15-7.**

As originally drafted and introduced, the Act (then known as S.B. 1090) would have authorized Connecticut's Department of Consumer Protection to "issue up to three casino gaming facility licenses to the Mashantucket Pequot Tribe and the Mohegan Tribe of Indians of Connecticut" to operate jointly-managed casinos in Connecticut.  *Id.* ¶ 22 (citation and quotation marks omitted).

In light of S.B. 1090's stark preferential treatment for the Preferred Tribes, Connecticut's Attorney General voiced concerns about its legality in a letter to State legislators.  *Id.* ¶ 23.  The Attorney General highlighted the risks associated with "granting the exclusive right to conduct gaming to the Tribes, particularly where that gaming will be conducted off reservation land," and advised that the Act may "violat[e] the Equal Protection Clause" or discriminate against out-of-state competitors in "violation of the Commerce Clause."  Letter from George Jepsen, Conn. Attorney General (Apr. 15, 2015) at 2 n.1 (attached as Exhibit 3).

The General Assembly responded by amending the statute into its current form, which was signed into law by Governor Malloy on June 19, 2015. *See* Am. Compl. ¶ 24. As enacted, the Act contains six major provisions:

- It allows the Preferred Tribes to form a "tribal business entity," defined as an entity "owned exclusively by both the Mashantucket Pequot Tribe and the Mohegan Tribe of Indians of Connecticut," which entity is to be registered by the Connecticut Secretary of State. Act § 1(a)(1). Only the Preferred Tribes may register a tribal business entity; indeed, the Act specifies that "the formation of more than one tribal business entity" is not permitted. *Id.* §§ 1(a)(1), 1(f).

- It gives the tribal business entity the right to "issue a request for proposals to municipalities regarding the establishment of a possible casino." *Id.* § 1(b). If the tribal business entity issues a request for proposals ("RFP"), the Act provides that the Connecticut Department of Consumer Protection "*shall* post such request for proposals on its internet web site." *Id.* § 1(b) (emphasis added).

- It grants municipalities new legal powers. Specifically, the Act states that "[a]ny municipality may respond to" the tribal business entity's RFP and "may enter into a development agreement with" the tribal business entity "regarding the establishment of a possible casino gaming facility in such municipality." *Id.* § 1(c). This provision is the only Connecticut statute allowing a municipality to enter into a contract regarding casino gambling. *See* Am. Comp. ¶¶ 27–28.

- It requires the tribal business entity to submit monthly reports to the Connecticut General Assembly, keeping state legislators up-to-date on the "activities of the tribal business entity." Act § 1(e).

- It contemplates that the Preferred Tribes will present their development agreement to the General Assembly during its 2016 session, at which point the General Assembly will consider "amendments to state law . . . that provide for the operation of and participation in a casino gaming facility by [the] tribal business entity." *Id.* § 1(c).[3] Indeed, the Act casts this additional step as an inevitability by providing that the Preferred Tribes "may not establish a casino gaming facility in the state *until*"—not *unless*—"the General Assembly has amended state law to provide for the operation of and participation in a casino gaming facility by such tribal business entity and such law has taken effect." Act § 1(d) (emphasis added).

---

[3] *See also* Transcript of House of Representatives Proceedings on Special Act 15-7 ("H.R. Tr.") (May 28, 2015) at 8 ("[A]n additional vote" on legislation "to provide for the operation of [a] casino by the Tribal Business entity . . . would happen in the next session, of course. So this amendment before us is basically a first step.") (statement of Rep. Dargan).

- Finally, it contains a severability clause, which prescribes that if any provision of the Act is found "invalid, unlawful or unconstitutional, the remaining provisions of [the Act] shall be inoperative and have no effect." *Id.* § 1(g).

The Act's legislative history confirms that the Act was intended to grant the Preferred Tribes an exclusive pathway to planning and developing a new commercial casino. Indeed, the Act was designed to answer the Preferred Tribes' request for "help" and to send "a message . . . that [the General Assembly] knows the importance of what these two corporate Native American tribes have done . . . over the past 20 years." H.R. Tr. at 23–24, 71 (statement of Rep. Dargan). In keeping with that "message," Representative Dargan agreed that the Act's benefits are "exclusively" for "the Mashantucket Pequot Tribe and the Mohegan . . . Tribe," such that "another tribe" or entity "would not" be able to proceed under the Act's development framework. *Id.* at 9–10 (colloquy of Reps. Zupkus and Dargan).[4]  The Preferred Tribes have recognized the General Assembly's efforts, "thank[ing] the members of the state Senate for supporting [the Act] and moving this vital legislation forward" and urging Governor Malloy to sign the Act into law. Am. Compl. ¶ 33 (citation and quotation marks omitted).

### C.    MGM's Interest In Casino Gaming In Connecticut.

As one of the world's leading global hospitality companies, MGMRI, the parent company of MGM, owns and operates 15 casinos in the United States. *Id.* ¶¶ 5, 43. MGM serves as MGMRI's development arm and regularly evaluates casino expansion and acquisition opportunities across the country. *Id.* ¶¶ 5, 45.  MGMRI is building two additional casinos in the

---

[4] *See also* S. Tr. at 3 (Act "will allow the two tribes the ability to approach municipalities . . . through a request for a proposal process" and to "wor[k] through the Department of Consumer Protection" in issuing that proposal) (statement of Sen. Larson); S. Tr. at 22–23 (Act is designed "to protect an industry, which has become an important industry in our state" and creates "a mechanism for the tribal entity, which is the two tribes working together in partnership . . . to solicit requests for proposals from municipalities") (statement of Sen. Looney); *see also* Am. Compl. ¶ 40.

United States—MGM National Harbor in Maryland and MGM Springfield in Massachusetts—and has recently evaluated development opportunities in other states.  *Id.* ¶¶ 43, 45.

As part of its development and expansion efforts, MGM has conducted a preliminary study analyzing the viability of a casino in Connecticut and concluded that such a development would be both feasible for MGM and desirable.  *Id.* ¶¶ 46–47.  Although the license for MGM Springfield prevents MGM from operating a casino within a 50-mile radius of that facility, MGM's analysis of the Connecticut market identifies potential casino sites beyond the 50-mile zone.  *See id.* ¶ 49.

Following on its interest in establishing and operating a casino in Connecticut, MGM attempted on July 23, 2015 to register a tribal business entity under the Act, but the Connecticut Secretary of State's office, operated by Defendant Merrill, rejected MGM's application.  The rejection notice concluded that the application "[did] not comply with Connecticut law" because MGM has "no affiliation with either of [the Preferred] Tribes."  *Id.* ¶ 53.  Because all activities authorized by the Act are reserved expressly for the "tribal business entity," *see* Act §§ 1(b), 1(c), 1(e), this refusal precludes MGM from using the Act's development framework.

### D.  The Casino Development Efforts Of The Preferred Tribes And Connecticut Municipalities Under The Act.

In contrast to MGM's thwarted effort to compete for casino-development opportunities in Connecticut, the Preferred Tribes and municipalities are exercising their rights under, and reaping the benefits provided by, the Act.  On August 24, 2015, Defendant Merrill granted the Preferred Tribes' application to register the tribal business entity, "MMCT Venture, LLC."  Am. Compl. ¶ 55.  During a press conference to celebrate formation of that entity, the Preferred Tribes, with state officials (including Lieutenant Governor Nancy Wyman) in attendance, lauded the event as a critical "first step" toward building a new gaming facility.  *Id.* ¶ 56 (citation and

quotation marks omitted).  Shortly thereafter, the Preferred Tribes delivered their RFP to the Department of Consumer Protection, managed by Defendant Harris, which promptly posted the RFP to its website, as required by the Act.  *See id.* ¶¶ 57–58; *see also* http://www.ct.gov/dcp/lib/dcp/mmct_request_for_proposal.pdf.

Three aspects of the RFP are particularly relevant.  *First*, the RFP highlights the Preferred Tribes' "partnership . . . with the State of Connecticut," as evidenced by the General Assembly's enactment of Special Act 15-7, the Secretary of State's registration of the Tribes' "joint venture," and the Department of Consumer Protection's dissemination of the document online.  Request for Proposals at 4–5 (attached as Exhibit 4).  *Second*, the RFP sets an ambitious timetable— requiring municipalities to submit proposals by November 6 and stating that the Preferred Tribes will select a winning bid by December 15, 2015—demonstrating the Preferred Tribes' intent to reach a development agreement and submit it to the General Assembly as "quickly and efficiently" as possible.  Am. Compl. ¶¶ 60–61; Ex. 4, Request for Proposals at 4, 6.  *Third*, although the Act allows the tribal business entity to pursue development opportunities anywhere in Connecticut, the RFP seeks responses only from municipalities "in the Hartford County region."  Ex. 4, Request for Proposals at 5.

Municipalities responded to the RFP immediately by initiating efforts to court the Preferred Tribes.  *See* Am. Compl. ¶ 62.  East Hartford's Planning and Zoning Commission approved a proposed casino site on September 23, and other municipalities held town hall meetings to discuss potential casino bids.  *Id.*  Despite having only weeks to prepare comprehensive proposals, four towns and one property owner submitted responses to the RFP.[5]

---

[5] When evaluating a motion to dismiss for lack of standing, a court may consider evidence outside the pleadings.  *See McKithen v. Brown*, 481 F.3d 89, 95-96 (2d Cir. 2007); *see also* Mot. at 10 (agreeing with this proposition).

*See Proposed Casino Receives Five Bids In Four Towns*, Hartford Bus. J. (Nov. 9, 2015) (attached as Exhibit 5).  The Preferred Tribes remain on track to select one of the proposals by December 15 and to submit a development agreement with the host municipality to the General Assembly for final approval at the start of the next legislative session in February 2016.  *See* Am. Compl. ¶ 64; *see also* Kenneth R. Gosselin, *With Deadline Looming, Two Towns Still Seeking A Casino*, Hartford Courant (Nov. 1, 2015) (attached as Exhibit 6).

### STANDARD OF REVIEW

"Although standing is a fundamental jurisdictional requirement," a court evaluates allegations of standing against "the same degree of proof that governs other contested factual issues" when assessing a motion to dismiss.  *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003).  That is, a court must "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party."  *Cortlandt Street Recovery Corp. v. Hellas Telecomms., S.à.r.l*, 790 F.3d 411, 417 (2d Cir. 2015) (citation, quotation marks and alterations omitted).

A plaintiff's "standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury."  *Baur*, 352 F.3d at 631.  Rather, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation and quotation marks omitted).

Defendants incorrectly assert that standing is judged on the facts in existence "'when the original complaint was filed.'"  Mot. at 20 (quoting *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152–53 (10th Cir. 2013)).  They ignore that the Supreme Court has held that "an amended complaint supersedes the original complaint,"  *Pac. Bell Tel. Co. v. Linkline*

10

*Commc'ns, Inc.*, 555 U.S. 438, 456 n.4 (2009), such that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction," *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007).[6] Tellingly, Defendants themselves rely on facts that postdate MGM's original complaint, filed August 4, 2015. *See, e.g.*, Mot. at 29 (citing October 1, 2015 news report regarding Preferred Tribes' RFP). Although the jurisdictional analysis comes out the same way regardless of which body of facts is used, pursuant to *Linkline* and *Rockwell*, the Court should consider the facts as alleged in MGM's amended complaint for purposes of deciding Defendant's Motion.

Finally, when evaluating ripeness, a court must look to the facts as they are at the time of its evaluation. *See Am. Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 302 n.4 (2d Cir. 1989) ("[I]t is irrelevant whether the case was ripe for review when the complaint was filed. Intervening events relevant to the ripeness inquiry should be considered and may be determinative.").

## ARGUMENT

### I.     MGM HAS ARTICLE III STANDING.

To establish Article III standing, MGM must allege that it has "suffered (1) a concrete, particularized, and actual or imminent injury-in-fact (2) that is traceable to defendant's conduct

---

[6] The Second Circuit and other courts are in accord. *See, e.g.*, *Travelers Ins. Co. v. 633 Third Assocs.*, 973 F.2d 82, 87–88 (2d Cir. 1992) (granting plaintiff leave to file supplemental pleading incorporating events occurring after original complaint filed to establish standing); *Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1043-1048 (9th Cir.) (treating amended complaint as supplemental pleading allowing plaintiff to plead subsequently-occurring facts to establish standing), *cert. denied*, 136 S. Ct. 240 (2015); *Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 617 (7th Cir. 2002) ("[T]he filing of the amended complaint was the equivalent of filing a new suit, and so it wouldn't matter had there been no jurisdiction over Morlan's original suit.").

and (3) likely to be redressed by a favorable decision." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (citations and quotation marks omitted).

MGM's Amended Complaint satisfies that test.  Specifically, MGM alleges that Special Act 15-7 excludes MGM from the only state-sanctioned process for developing a new commercial casino and confers exclusive competitive benefits on the Preferred Tribes, thereby making it impossible for MGM to compete on equal footing. *E.g.*, Am. Compl. ¶¶ 6, 30–35, 40, 70-71, 80, 88.  These injuries are caused directly by the Act's discriminatory terms and are redressable by a declaration that the Act is unconstitutional under the Equal Protection and dormant Commerce Clauses.

### A.    The Act Injures MGM By Denying It The Opportunity To Compete On Equal Footing In Planning And Developing A Connecticut Casino.

Article III sets a "low threshold" for establishing injury-in-fact, *WC Capital Mgmt., LLC*, 711 F.3d at 329, particularly "at the pleading stage," *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 18 (D.C. Cir. 2011).  It is blackletter law that *any* identifiable injury suffices.  As the Second Circuit has observed, "the injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice." *MTBE*, 725 F.3d at 105 (citation, quotation marks and alterations omitted).  In determining whether the plaintiff has cleared that low bar, the court must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party.  *See Cortlandt*, 790 F.3d at 417; *see also Baur*, 352 F.3d at 631.

The types of injury that suffice to confer standing are informed by the substantive law underlying the plaintiff's claims.  MGM's challenges to Special Act 15-7 arise under the Equal Protection and dormant Commerce Clauses of the United States Constitution.  *See* Am. Compl. ¶¶ 68–97.  In cases brought under those provisions, courts have consistently held that the

inability to compete on a level playing field constitutes a legally cognizable injury. The Supreme Court has explained that a plaintiff suffers an injury cognizable under the Equal Protection Clause when the "government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group" and that in such cases, the "'injury-in-fact' is the inability to compete on an equal footing," "not the ultimate inability to obtain the benefit," *Jacksonville*, 508 U.S. at 666; *accord Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994). Similarly, an allegation that state law "impinges on [plaintiff's] rights to compete on an equal footing in interstate commerce" suffices to establish an injury-in-fact under the dormant Commerce Clause. *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995).

Indeed, courts routinely recognize that government-imposed competitive disadvantages give rise to actual, concrete injuries when a party asserts claims under the Equal Protection or dormant Commerce Clauses. *See, e.g.*, *Schutz v. Thorne*, 415 F.3d 1128, 1133–34 (10th Cir. 2005) (out-of-state plaintiff "can demonstrate standing [to assert Equal Protection and dormant Commerce Clause claims] if he can show that he applied for a hunting license and that Wyoming law made the 'benefit' more difficult to obtain because of its preference system"); *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 404 (6th Cir. 1999) (Indian tribe challenging state and local casino-development laws under Equal Protection Clause demonstrated injury-in-fact where tribe was "able and ready to bid for a casino license" but prevented from doing so on equal basis); *KG Urban Enters., LLC v. Patrick*, 839 F. Supp. 2d 388, 397 (D. Mass.) (plaintiff casino-development company demonstrated injury-in-fact where it demonstrated it was able and ready to compete for casino license, but state law gave preference to Indian tribes), *aff'g standing and rev'g on other grounds by* 693 F.3d 1, 16 n.13 (1st Cir. 2012); *Alliance For Clean Coal v. Bayh*, 888 F. Supp. 924, 930 (S.D. Ind.)

(plaintiff challenging state law under dormant Commerce Clause alleged injury-in-fact where state law "impose[d] a bias in favor of" in-state producers, which was "all the injury Plaintiff need allege"), *aff'd*, 72 F.3d 556 (7th Cir. 1995).

Accordingly, to establish standing, MGM need not allege that but for the Act it would reach agreement with a municipality for development of a casino and have that agreement approved by the General Assembly.   Rather, MGM need allege only that it is capable of competing for such opportunities but is being denied a chance to do so on equal footing.  *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (plaintiff "need not demonstrate that it has been, or will be, the low bidder on a Government contract" to establish injury-in-fact); *Miller*, 44 F.3d at 594 ("[T]he showing of specific 'lost opportunities' is [not] required.  . . .  Despite the absence of evidence of specific lost deals, this competitive injury is neither 'conjectural' nor 'hypothetical'—the injury is . . . the inability to compete on an equal footing." (citations and quotation marks omitted)).  In other words, to establish standing MGM "need only demonstrate that it is able and ready" to compete for a casino-development project "and that a discriminatory policy prevents it from doing so *on an equal basis*."  *Jacksonville*, 508 U.S. at 666 (emphasis added).

Applying these principles here, MGM has alleged that it is suffering precisely the sort of particularized injury necessary to establish standing.  Specifically, Connecticut's Special Act 15-7 injures MGM because, despite being "ready, willing, and able to compete for the opportunity to develop a commercial casino facility in Connecticut,"  MGM "is excluded by the Act from competing for this opportunity."  Am. Compl. ¶ 6. Even if MGM were able to compete for a casino-development project, it would be doing so "at a competitive disadvantage" by virtue of

the legislative endorsement and assistance from state agencies only the Preferred Tribes enjoy under the Act.  *Id.* ¶ 66; *see also id.* ¶¶ 6, 31-32.

### 1.    The Act Excludes MGM from the Only Legal Pathway to Development of a Commercial Casino.

As alleged in the Amended Complaint, the Act injures MGM because it allows only the Preferred Tribes to take steps to develop a new commercial casino.  Under Connecticut law, a municipality "can exercise only such powers as are *expressly* granted to it, or such powers as are necessary to enable it to discharge the duties and carry into effect the objects and purposes of its creation."  *Wellswood Columbia, LLC v. Town of Hebron*, 992 A.2d 1120, 1128 (Conn. 2010) (emphasis added) (citation and quotation marks omitted).  Here, the only authority municipalities have to execute a casino-development agreement arises under the Act; specifically, the Act authorizes "[a]ny municipality" to "respond to" the Preferred Tribes' RFP and to "enter into a development agreement with" the Preferred Tribes "regarding the establishment of a possible casino gaming facility in such municipality."  *Id.* § 1(c).  In contrast, municipalities cannot execute a casino-development agreement with MGM because they have no "expres[s]" authority to do so.  *See Wellswood*, 992 A.2d at 1128.

Defendants' arguments that the Act does not "allow the Tribes or municipalities to do anything they (or MGM) could not already do before SA 15-7 was enacted" are at best disingenuous.  Mot. at 16.  There are five reasons.

*First*, Defendants' arguments defy the basic principle that a legislature passes legislation to effect a change in the law, and so a court may not "assume that a legislative enactment is devoid of purpose."  *Perille v. Raybestsos-Manhattan-Europe, Inc.*, 494 A.2d 555, 562 (Conn. 1985) (citation and quotation marks omitted).  Defendants' interpretation would render much of the Act superfluous.  If municipalities were already authorized to respond to casino-development

15

RFPs and to enter into casino-development agreements, the Act's authorization of those steps would be meaningless.  But "interpreting a statute to render some of its language superfluous violates cardinal principles of statutory interpretation.  It is a basic tenet of statutory construction that the legislature does not intend to enact meaningless provisions." *Am. Promotional Events, Inc. v. Blumenthal*, 937 A.2d 1184, 1191 (Conn. 2008) (citation, quotation marks and alteration omitted).

*Second*, Defendants' position is flatly inconsistent with the General Assembly's own understanding of the Act.  As the statements of the Act's co-sponsors illustrate, the Act's purpose is to change the status quo by giving the Preferred Tribes, and only the Preferred Tribes, "the ability" to negotiate and enter into a casino-development agreement with a municipality. *E.g.*, H.R. Tr. at 4, 18 (statements of Rep. Dargan);[7] *see also* S. Tr. at 22 (Act "provides a framework for a potential creation of an additional Casino in Connecticut") (statement of Sen. Looney); OLR Bill Analysis for S.B. 1090 (explaining that bill "allows" Preferred Tribes to issue RFP and "allows" Preferred Tribes to enter into casino-development agreement with municipalities) (attached as Exhibit 7).  As explained by another of the Act's co-sponsors:

> [C]ompetition from our neighboring states threaten their business and present a challenge.  In response to this, *they've asked for our help*.  These two casinos have joined forces to protect Connecticut jobs and their stronghold as a world-class entertainment and gambling destination.  This bill today is one step in a pragmatic approach to support a world-class institution.  *This bill will allow the two tribes the ability to approach municipalities in the state through a request for a proposal process to locate a facility off the current Indian reservation.*

---

[7] Statements of a bill's sponsors are "entitled to weight" in interpreting legislation.  *Lewis v. United States*, 445 U.S. 55, 63 (1980); *see also State v. Guckian*, 605 A.2d 874, 880 (Conn. App. Ct. 1992) ("[S]tatements are entitled to particular weight and careful consideration in discerning legislative intent when they are made by the bill's sponsor."), *aff'd*, 627 A.2d 407 (Conn. 1993).

S. Tr. at 2–3 (statement of Sen. Larson) (emphases added).[8]

*Third*, Defendants incorrectly assert that municipalities "generally have the authority to execute contracts," and therefore may enter into casino-development agreements with MGM. *See* Mot. at 16. Although as a general matter municipalities may "provide for the execution of contracts," this general power must be read in conjunction with the Act, which speaks to negotiation and execution of a casino-development agreement. It is well-established that "the implications of a statute may be altered by the implications of a later statute," particularly "where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand," in which case such subsequent statutes "should control . . . construction of the [earlier] statute." *Nutritional Health Alliance v. FDA*, 318 F.3d 92, 102 (2d Cir. 2003) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000)); *see also Tomlinson v. Tomlinson*, 46 A.3d 112, 120 (Conn. 2012) (specific terms in one statute supersede general terms in another). Here, that principle dictates that the specific, later enactment—Special Act 15-7— takes precedence over the general one cited by Defendants and that municipalities may execute casino-development agreements *only* with the Preferred Tribes.

---

[8] The statement by Senator Fasano cited by Defendants (at 17) does not demonstrate a contrary understanding of the Act's intent. As an initial matter, Senator Fasano *opposed* the Act, and statements of legislators opposing a bill are entitled to little, if any, weight. *See Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 29 (1988) ("This Court does not usually accord much weight to the statements of a bill's opponents."); *Cotto v. United Techs. Corp.*, 738 A.2d 623, 630 n.7 (Conn. 1999) ("[T]he comments of opponents of a bill ordinarily are entitled to less weight than are those of its proponents. . . ."). Moreover, Senator Fasano did not speak to any of the conduct forming the basis for MGM's claim, but rather only to the ability of the Preferred Tribes to "start talking" to municipalities and to "discuss proposals" and "do projections," S. Tr. at 19, which the Preferred Tribes could do without the Act. Regardless, Senator Fasano's remarks show that he too understood that the Act endorses the Preferred Tribes' efforts. *See id.* at 20 ("[W]hat this bill does is says we as a Legislature are asking you as a Tribe and you as a municipalit[y] if you're interested to get together and work hard with the Department of Consumer Protection . . . to review proposals to put forth a project. . . .").

More fundamentally, absent further legislation, Connecticut municipalities may not enter into an agreement for operation of a new casino. Casino gambling is illegal under Connecticut law, Conn. Gen. Stat. §§ 53-278b(b), 53-278a(3), and "[a] contract made for or about any matter or thing which is prohibited and made unlawful by statute is a void contract," *Solomon v. Gilmore*, 731 A.2d 280, 289 (Conn. 1999). Thus, absent some other express authorization, municipalities may not enter into contracts "for or about" casino gambling—including agreements to develop a new casino. Indeed, the Act defines a "[c]asino gaming facility" as a "facility intended to be used for professional gambling, *as defined in section 53-278a of the general statutes*." Act § 1(a)(3) (emphasis added). The Act's focus on a casino gaming facility as defined by a criminal statute underscores that in the absence of the Act, a development agreement for such a facility would be impermissible. In essence, Defendants' argument amounts to the remarkable proposition that municipalities' general power to execute contracts grants them authority to enter into contracts—whether contingent or not—for "any matter or thing which is prohibited and made unlawful by statute." *Solomon*, 731 A.2d at 289.

*Fourth*, there is likewise nothing to Defendants' claim that the Act does not prejudice MGM because MGM has "completed a preliminary feasibility study" and "analyze[d] the viability of a potential casino development in Connecticut." Mot. at 12. Of course, one does not need statutory authority to conduct a study, and MGM has never claimed that the Act prevents it, or any other entity, from studying the Connecticut gaming market. That MGM conducted a study is irrelevant to the issue in this case: whether the Act unlawfully excludes MGM from participating in the Act's casino-development process.

*Fifth*, and finally, Defendants' only attempt to explain why the Act singles out the Preferred Tribes for special treatment is a vague and irrelevant reference to "the state's unique

18

interests and concerns in the context of tribal gaming."  Mot. at 15.  Defendants do not explain

what specific "unique interests" are implicated or how the Act addresses them.  In any event, the

Act cannot be justified by a need to regulate "an expansion of tribal gaming" because it

contemplates establishment of a *commercial* casino, on *non*-Indian lands—not an IGRA-

authorized tribal casino.

In sum, none of Defendants' arguments negate the fundamental fact that the Act excludes

MGM from participating in the only casino-development process authorized by Connecticut law.

The Act functions as a discriminatory barrier, preventing MGM from competing for casino-

development opportunities on equal terms with the Preferred Tribes, and that is all MGM must

allege to establish standing.  *See Comer*, 37 F.3d at 793; *Miller*, 44 F.3d at 594.

### 2.    The Act Prevents MGM From Competing on Equal Footing in Executing a Development Agreement.

Even if MGM could execute a casino-development agreement outside the Act's legal

framework, the Act still grants the Preferred Tribes a competitive advantage, and thereby injures

MGM, in two distinct ways—each of which is sufficient to confer standing.

*First*, the Act makes the State an active partner in the Preferred Tribes' casino-

development efforts from beginning to end, signaling to municipalities, investors, and the public

that those efforts—and only those efforts—are backed by the government.  *See* Am. Compl. ¶¶

26, 31, 63.[9]  The Act supports the Preferred Tribes from the outset by authorizing the Preferred

Tribes to register a tribal business entity with the Secretary of the State.  The Act then allows this

---

[9] Indeed, during a quarterly earnings call, the President of the Mohegan Tribal Gaming Authority touted the support the Preferred Tribes are receiving from the legislature, telling the investment community:  "All we can say is . . . *we* certainly have the support of the legislature."  Transcript of Mohegan Tribal Gaming Authority Third Quarter Fiscal 2015 Earnings Call (July 29, 2015) at 16 (emphasis added) (attached as Exhibit 10).  Tellingly, this comment came in response to a question from an analyst about *MGM*'s options.

entity to issue an RFP to municipalities, mandates that the Department of Consumer Protection post the RFP on its website, and authorizes municipalities to respond to the RFP and to execute a casino-development agreement with the Preferred Tribes.  Throughout this process, the Act provides the Preferred Tribes with a formal avenue for keeping legislators apprised of their efforts by requiring the tribal business entity to submit monthly status reports to the General Assembly, thus allowing the legislature to "vet the process" before a proposal is officially presented for a vote.  H.R. Tr. at 25 (statement of Rep. Dargan).  And once the Preferred Tribes have reached agreement with a municipality, the Act provides a ready-made mechanism for presenting that agreement to the General Assembly for approval.  *See* H.R. Tr. at 71–72 (Preferred Tribes are "asking tonight for . . . the opportunity—through this Business Entity—to come back to us in a comprehensive bill next year, so we as a legislature . . . can look at that issue and many other issues.") (statement of Rep. Dargan).[10]

*Second*, the Act grants the Preferred Tribes the exclusive right to have their RFP posted to the Department of Consumer Protection's website—a provision that by itself renders the Act unconstitutional.  *See* Act § 1(b).  Significantly, Defendants concede "that SA 15-7 does not allow MGM to have its RFP 'disseminated' by the state through placement on the DCP's website."  Mot. at 28.[11]  By mandating that the Department of Consumer Protection "shall post

---

[10] *See also* H.R. Tr. at 7–8 ("[T]he Tribal Business Entity may only establish a casino if this body amends state law to provide for the operation of [a] casino by the Tribal Business Entity. . . . So, this legislation would happen in the next session of course.") (statement of Rep. Dargan).

[11] Defendants attempt to downplay the significance of the publication and dissemination of the Preferred Tribes' request for proposals with the baffling suggestion that the absence of a "fiscal cost" to posting a document on a state agency's website means that posting the RFP "on the DCP website ha[s] no . . . value."  Mot. at 29.  Whether it costs the Department of Consumer Protection an identifiable sum to post on its website has no bearing on whether such a posting confers a benefit on the Preferred Tribes.  Likewise, that the Preferred Tribes have "utiliz[ed] an independent website to primarily coordinate *responses to the RFP*" does nothing to support the (continued…)

such request for proposals on its Internet webs site," the Act provides the Preferred Tribes with a free, state-sponsored marketing service, again signaling to municipalities, property owners, investors, and the public that the Preferred Tribes' development plans—and only their plans—have the backing of the State.   Act § 1(b).   This "unequal treatment in the provision of . . . [government] benefits" is a classic example of injury-in-fact.  *Heckler v. Mathews*, 465 U.S. 728, 738 (1984).

In short, the Act ensures the State's involvement in and support of the Preferred Tribes throughout the development process, putting a thumb—indeed, the whole hand—on the scale in favor of the Preferred Tribes' development efforts.  Am. Compl. ¶¶ 31–32.  In so doing, the Act harms MGM by "imping[ing] on [its] rights to compete on an equal footing."  *Miller*, 44 F.3d at 594; *Comer*, 37 F.3d at 793; *cf. Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1199 (D.C. Cir. 2015) (plaintiffs established standing to challenge IRS program listing tax-return preparers in the IRS' online directory "because the Rule distorts the competitive marketplace and dilutes [Institute] members' credentials by introducing a government-backed credential and government-sponsored public listing").

Nor is there anything to Defendants' attempts to avoid this conclusion by suggesting that the Act's benefits are actually burdens imposed only on the Preferred Tribes and that, in any case, whatever competitive disadvantage MGM faces, it is "not enough" to establish injury-in-fact.  This is so for five reasons.

*First*, Defendants gloss over the most telling point of all:  The Preferred Tribes are taking advantage of the processes established by the Act.  Nothing in the Act forces the Preferred Tribes

---

notion that the state agency's free publicity of the RFP (or the signaling effect generated by placement of the RFP on a state government website) carries no value.  *Id.* (emphasis added)

to engage in its processes—the Act provides that the Preferred Tribes "may" issue an RFP and "may" negotiate with municipalities under the Act.  Act § 1(b), 1(c).  And the Act's purported restrictions apply only if the Preferred Tribes move forward *under the Act*—for instance, the Preferred Tribes need submit reports to the legislature only if they register a tribal business entity and issue an RFP "pursuant to subsection [1](b) of" the Act.  Act § 1(e).  Actions speak louder than words—if Defendants were correct that the Act provides no advantages, the Preferred Tribes would have followed the path Defendants assert MGM can take by pursuing casino development opportunities in Connecticut outside the Act's framework, which would allow them to avoid the "complications" of the Act's "extensive reporting requirements" and "substantial procedural hurdle[s]."  Mot. at 14, 26.  Instead, the Preferred Tribes have elected to follow the path established by the Act.

*Second*, Defendants incorrectly imply that MGM cannot establish injury-in-fact unless MGM is excluded from approaching municipalities in regard to development of a commercial casino.  *See, e.g.*, Mot. at 11–13.  It is well established that regardless of whether a government policy functions as a total exclusion, granting a competitive edge to one group gives rise to an injury sufficient to establish Article III standing.  *See e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) ("We have held . . . that a denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result."); *Adarand*, 515 U.S. at 211 (subcontractor-plaintiff was not excluded from bidding on contracts, but government policy of giving contractors a financial incentive to hire other subcontractors was sufficient to establish

22

injury-in-fact; the "discriminatory classification prevents the plaintiff from competing on an equal footing" (citation, quotation marks and alterations omitted)).[12]

*Third*, Defendants' attempt to recast the benefits of the Act as mere "reporting requirements" and "procedural" hurdles defies common sense and is contrary to the contemporaneous comments of the Act's sponsors. Mot. at 13–14. Indeed, the Act's sponsors touted the legislation as a response to the Preferred Tribes' request for "help" and as a way to "giv[e]" the Preferred Tribes "the opportunity to form that Business Entity and then enter into an agreement with a host community." S. Tr. at 3 (statement of Sen. Larson); H.R. Tr. at 18 (statement of Rep. Dargan). As the legislative history makes clear, the overwhelming sentiment of the General Assembly was that "there is nothing that [they] should not do to support these two business entities." S. Tr. at 8 (statement of Sen. Osten).

Unsurprisingly, the Preferred Tribes likewise view the Act as a benefit. Upon approval by the General Assembly, the Preferred Tribes issued a joint statement expressing their "hop[e]" that the "legislation would be signed by the Governor" to "begin a process by the Mohegan and Mashantucket Pequot Tribes to invest millions to identify the best site for a satellite gaming facility in north central Connecticut." Am. Compl. ¶ 33 (citation and quotation marks omitted). When the Act was passed, the Preferred Tribes "celebrated" and "thank[ed] the members of the

---

[12] *See also Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989) (plaintiff not excluded from running for President, but discriminatory exclusion from national debate was "loss of competitive advantage," which "constitute[d] sufficient 'injury' for standing purposes, because such loss palpably impaired Fulani's ability to compete on an equal footing with other significant presidential candidates."); *In re U.S. Catholic Conference*, 824 F.2d 156, 165-66 (2d Cir. 1987) ("The plaintiffs have claimed direct, personal injury arising from the fact that the federal defendants' failure to enforce the political action limitations of section 501(c)(3) has placed the plaintiffs at a competitive disadvantage with the Catholic Church in the arena of public advocacy on important public issues. That is a substantial basis on which to predicate standing."), *rev'd on other grounds*, 487 U.S. 72 (1988).

state Senate for supporting S.B. 1090 and moving this vital legislation forward." *Id.* (citation and quotation marks omitted).

Even assuming that there is any doubt as to whether the Act in fact confers benefits on the Preferred Tribes, MGM has plausibly alleged that the Preferred Tribes are benefitted by the Act, Am. Compl. ¶¶ 30–35, 40, 71, 80, 88, and those allegations must be accepted as true for purposes of Defendants' motion to dismiss. *See Cortlandt*, 790 F.3d at 417 (court must "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party" (citation, quotation marks and alterations omitted)); *Baur*, 352 F.3d at 631 ("standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury"). Defendants' parochial view to the contrary is irrelevant for purposes of this motion; the only question before the Court is whether MGM's Amended Complaint alleges facts that, *if proven*, would support standing. *See United States v. Coluccio*, 51 F.3d 337, 340 (2d Cir. 1995); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010).

*Fourth*, although Defendants concede that MGM has alleged injury by virtue of the "competitive disadvantage" caused by the Act, they wrongly assert that such harm is "not enough." Mot. at 32. As discussed, competitive disadvantage is precisely the type of harm courts have found sufficient to confer standing in Equal Protection and dormant Commerce Clause cases. *See Jacksonville*, 508 U.S. at 666; *Miller*, 44 F.3d at 594.

*Fifth*, and finally, Defendants' unsupported statement that "other restrictions and reporting requirements . . . outweigh any benefit to MGM from being able to post [a request for proposals] on the DCP's website" is not relevant to standing. Mot. at 29. In evaluating standing, courts do not weigh purported offsetting benefits against disadvantages created by a government policy. *See Denney*, 443 F.3d at 265 ("[T]he fact that an injury may be outweighed by other

benefits . . . does not negate standing."); *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (same).

**B.     MGM's Injury Is Present And Ongoing.**

By virtue of being denied an opportunity to compete on equal footing, MGM is *presently* injured by the Act.  Indeed, the harm to MGM is only increasing as the Preferred Tribes continue to exercise their rights under the Act because the Preferred Tribes are getting further and further ahead in the casino-development process and will have a competitive advantage even if the process is begun anew in a form that allows MGM to participate (among other things, the Tribes already have RFP responses from municipalities in hand).  Defendants' argument that MGM's injury is "too speculative" relies on a fundamental mischaracterization of the nature of the injury MGM has alleged and a misconceived notion of the burden MGM must meet to establish standing.

**1.     The Act's Contemplation of Additional Legislation Does Not Make MGM's Injury "Speculative."**

Two flawed assumptions underlie Defendants' argument that MGM has alleged only a "threatened injury" that may never come to pass because "none of [the] seven steps" that Defendants identify as necessary "before the Tribes could operate an additional casino" "had been completed" when MGM filed its original complaint.[13]  Mot. at 19–21.

The first is Defendants' apparent and mistaken belief that MGM claims injury based on operation of a "casino in Connecticut that would compete with MGM's planned casino in Springfield, Massachusetts."  Mot. at 19.  Nowhere in its Amended Complaint does MGM allege

---

[13] Contrary to Defendants' assertion, the facts as alleged in MGM's original complaint of August 2, 2015 are sufficient to establish injury-in-fact.  Thus, although the Court may look to events as they were as of the date of the Amended Complaint, even if such facts are not considered, MGM has established standing.  *See, e.g.*, *Rockwell*, 549 U.S. at 473–74; *Travelers*, 973 F.2d at 87–88.

that it suffers harm by virtue of fair competition with the gaming facility planned in Springfield. Rather, MGM is harmed because the Act denies it the ability "to compete on an equal footing" for commercial casino development opportunities in Connecticut. *Jacksonville*, 508 U.S. at 666.

The second, related, assumption is the mistaken view that MGM is harmed only once the Preferred Tribes have state authorization to operate a new casino. *See* Mot. at 24 (arguing that because "the General Assembly must 'amend[ ] state law to provide for the operation of . . . a casino' . . . before any tribal business entity can operate another casino," MGM is "preclude[d] . . . from claiming an injury based on SA 15-7 that is not completely hypothetical" (citation omitted)). To the contrary, the harm to MGM is "not the ultimate inability to obtain" the right to operate a casino in Connecticut, but rather the "the inability to compete on an equal footing" for such a right. *Jacksonville*, 508 U.S. at 666; *see also id.* ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier."). That injury arose once the Act was passed, is ongoing, and is in no way dependent on future events. *See Miller*, 44 F.3d at 594 ("Despite the absence of evidence of specific lost deals, this competitive injury is neither 'conjectural' nor 'hypothetical'—the injury is not a particular lost sale but the 'inability to compete on an equal footing.'" (citation omitted)); *KG Urban Enters.*, 839 F. Supp. 2d at 397 ("Even though the Region C application process has not been and may never be opened, KG Urban has demonstrated that it would be a competitive candidate if it were given the chance to compete. Under the circumstances, that is all that is required [for standing]."), *aff'g standing, but rev'g on other grounds*, 693 F.3d 1, 16 n.13 (1st Cir. 2012).[14]

---

[14] Defendants' attempt to paint a picture of uncertainty is not only irrelevant to the analysis of MGM's injury, but is also belied by the facts. In little over a month after registering the tribal (continued…)

Finally, Defendants' reliance on *DaimlerChrysler Corp. v. Cuno* is misplaced.  That decision simply applies the rule against taxpayer standing and does nothing to disturb the well-established rule that a plaintiff suffers injury-in-fact when denied equal treatment.    In *DaimlerChrysler*, state taxpayers alleged injury on the basis of tax credits given manufacturers willing to invest new capital in the state; the plaintiffs claimed that, by "deplet[ing] the funds of the State of Ohio," the tax breaks "diminish[ed] the total funds available for lawful uses and impos[ed] disproportionate burdens" on them.  *DaimlerChrysler v. Cuno*, 547 U.S. 332, 343 (2006) (citation and quotation marks omitted).  In holding that plaintiffs lacked standing, the Supreme Court observed that it was unclear whether the tax breaks would have a net negative impact on the state treasury and that even assuming a reduction in revenue, plaintiffs' allegation that the tax breaks would increase their own tax bill required speculating about "how legislators [would] respond" to a shortfall in revenue.  *Id.* at 344.  The plaintiffs' alleged injury in that case is therefore not remotely similar to that alleged by MGM here:  Whereas the *DaimlerChrysler* plaintiffs might never have experienced an increase in their tax burden, MGM has already suffered (and continues to suffer) denial of equal treatment by virtue of being denied benefits and development opportunities afforded by the Act.

### 2.    The 50-mile Radius Restriction Is Not an Independent Bar to MGM's Ability to Compete for and Operate a Casino in Connecticut.

Defendants likewise miss the mark when they urge that the 50-mile radius restriction in the license governing MGM Springfield somehow "precludes MGM from establishing standing

---

business entity on August 24, 2015, the Preferred Tribes prepared a request for proposals, delivered it to the Department of Consumer Protection, and had it posted on that agency's website.  *See* Am. Compl. ¶¶ 55–58.  Municipalities have responded with similar swiftness; within a month of the registration of the tribal business entity, East Hartford had approved a proposed casino site while other towns have also entertained discussions about hosting a casino for the Preferred Tribes.  *See* Am. Compl. ¶ 62.

to challenge SA 15-7." Mot. at 22. Defendants' argument would require MGM to adduce facts proving that it would be successful in reaching a development agreement within a particular region—a position that, again, fails to comprehend the nature of MGM's injury and, in any case, postulates a burden beyond that required at the pleading stage.

As noted, "[t]o establish standing" MGM "need only demonstrate that it is *able and ready to bid on contracts* and that a discriminatory policy prevents it from doing so on an equal basis." *Jacksonville*, 508 U.S. at 666 (emphasis added); *see also Lac Vieux*, 172 F.3d at 404 ("standing issue hinges on whether [plaintiff] has sufficiently alleged that it is able and ready to bid for a casino license" (quotation marks omitted)). The Amended Complaint explains that MGM has "completed a preliminary feasibility study" analyzing the viability of a potential casino in Connecticut outside the 50-mile radius and concluded that "[t]here are many potential casino sites in Connecticut beyond the 50-mile radius restriction." Am. Compl. ¶¶ 47, 49. Bridgeport is one example, among "[o]ther sites outside the 50-mile radius" that MGM identifies as a viable potential location. *Id.* ¶ 49. That potential casino sites exist outside the 50-mile radius is alone sufficient to overcome Defendants' argument, as MGM is plainly eligible to compete for casino-development opportunities in Connecticut.

Defendants' response is a red herring. Specifically, Defendants assert that it "appear[s] . . . likely that most, if not all, of the municipalities likely to respond to any RFP . . . are within the 50-mile radius restriction in the state license governing MGM Springfield," which consequently "precludes MGM from establishing standing." Mot. at 21–22 (citation and quotation marks omitted). What Defendants ignore is that even though the Act authorizes the Preferred Tribes to pursue casino-development opportunities throughout the State, the Preferred Tribes of their own accord limited their RFP to "the Hartford County region." Exhibit 4,

Request for Proposals at 5; *see also* Preferred Tribes Press Release (Oct. 1, 2015) (announcing that RFP was "for the new facility that will be located north of Hartford") (attached as Exhibit 8). Responses to an RFP with specific geographic restrictions obviously shed no light on whether *other* municipalities might have responded to a different RFP with different geographical preferences. Regardless, the municipalities' responses to the RFP are irrelevant to the analysis because MGM challenges the Act, which imposes no geographical constraints of any kind.

Defendants' argument is also wrong as a matter of law. The argument is akin to suggesting that after being denied an opportunity to compete for a benefit on equal terms, MGM has not been harmed because it cannot prove that it would have been successful in partnering with one of the "many potential" municipalities beyond the 50-mile radius. Am. Compl. ¶ 49. Courts have repeatedly rejected arguments of this sort: MGM "need not allege that it would have been awarded a contract but for the preferential and thereby allegedly unconstitutional [development process], but only that it was capable of submitting a proposal." *Lac Vieux*, 172 F.3d at 405; *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) ("[E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the [discriminatory admissions policy], it would not follow that he lacked standing. . . . The trial court found such an injury, apart from failure to be admitted, in the University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race. Hence the constitutional requirements of Art. III were met.").

The same is true of Defendants' claim that MGM has failed to establish standing because "there is no indication" that Bridgeport, or any other of the many potential municipalities outside the 50-mile radius restriction, "currently ha[ve] an interest in a casino." Mot. at 23–24. Municipalities such as Bridgeport are not in Hartford County and so would not have been able to

respond to an RFP limited to that county.  In any event, interest on behalf of municipalities serves to demonstrate only whether MGM's efforts to reach a development agreement would be successful and are therefore irrelevant to standing.  *See, e.g.*, *Lac Vieux*, 172 F.3d at 404–05 (that an "earlier attempt to establish a casino in Detroit had not gone through" was merely "evidence of whether a proposal that [plaintiff] might have submitted would ultimately have been successful" and was "not indicative of whether [plaintiff] had the capability simply *to submit* a proposal" (emphasis in original)).

Defendants also err by relying on the absence of allegations showing that MGM has "taken . . . concrete steps toward an agreement with Bridgeport."  Mot. at 23.  MGM need show only that it is "able and ready" to compete on equal footing for casino development opportunities—not that it has already tried and failed.  *See Lac Vieux*, 172 F.3d at 406 (failure to prepare specific proposal not necessary to establish standing; it was "sufficient that [plaintiff] has shown that it could have submitted a timely proposal and that it was still ready to do so, should the preference be struck down and the bidding process started over"); *see also Jacksonville*, 508 U.S. at 666.

### C.     The Act Causes MGM Injury That Will Be Redressed By A Declaration That The Act Is Unconstitutional.

The remaining requirements for Article III standing—causation and redressability—are easily satisfied here.  As to causation, the Act causes MGM's competitive injury because it is the Act's discriminatory text that prevents MGM from participating in the casino-development process and from competing with the Preferred Tribes on equal terms.  A declaration that the Act is unconstitutional would redress those injuries by eliminating the unlawful discrimination alleged in MGM's Amended Complaint and putting MGM on equal legal footing with the Preferred Tribes.  *See Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d

Cir. 2006) (plaintiff alleged government policy discriminated on basis of race and prevented plaintiff from "competing on equal footing"; injury "would be redressed by[ ] an injunction ordering that [plaintiff] be treated the same as are non-Spanish Hispanics"); *Jacksonville*, 508 U.S. at 666 n.5 ("It follows from our definition of 'injury in fact' that petitioner has sufficiently alleged both that the city's ordinance is the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury.").

Defendants do not seriously contest these points. They do not challenge causation, and their argument on redressability (at 27–29) merely recapitulates the points described above and hence fails for the same reasons. *See supra* Part I.A.2.

### D.     Neither Abstention Nor Certification Is Warranted.

Out of an abundance of caution, we address Defendants' passing suggestion that the Court should abstain under *Pullman* or certify issues of Connecticut law to the Connecticut Supreme Court. Neither approach is appropriate here.

As an initial matter, Defendants' abstention and certification arguments are waived because they appear exclusively in two footnotes, with no explanation or development. *See* Mot. at 11 n.2, 18 n.6. Cursory arguments of this kind, "adverted to in a perfunctory manner . . . are deemed waived." *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) (citation and quotation marks omitted). Indeed, the waiver "rule has particular force where [a litigant] makes an argument only in a footnote." *Id.*; *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) ("We ordinarily deem an argument to be forfeited where it has not been sufficiently argued in the briefs, such as when it is only addressed in a footnote." (citations and quotation marks omitted)).

Even if Defendants' arguments were not waived, they fail on the merits.

Starting with *Pullman* abstention, that doctrine may be applicable only where "three conditions are met:  (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; *and* (3) the law is susceptible to an interpretation by a state court that would avoid or modify the federal constitutional issue." *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 385 (2d Cir. 2000) (emphasis added) (citation and quotation marks omitted).

As the Second Circuit has cautioned, however, "abstention is generally disfavored, and federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction."  *Niagara Mohawk Power Corp.*, 673 F.3d at 100 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)); *see also Vermont Right to Life,* 221 F.3d at 385 (analyzing *Pullman* abstention and noting "doctrine of abstention is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it" (citation, quotation marks and alteration omitted)).  Thus, abstention "is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law." *Vermont Right to Life*, 221 F.3d at 385 (citation and quotation marks omitted).  And a statute is not "rendered 'unclear' merely because no state court has yet construed" it.  *Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus*, 60 F.3d 122, 126 (2d Cir. 1995).

Here, none of the conditions for *Pullman* abstention is met, much less all three.  As explained above, the Act is clear on its face.  Resolution of MGM's constitutional challenges does not depend on interpretation of the Act; nor is the Act susceptible of an interpretation that would avoid or modify the constitutional issues presented.  Under any plausible interpretation of the Act, the Act confers a competitive advantage on the Preferred Tribes, and MGM has standing

to challenge that competitive advantage as unlawful under the Equal Protection and dormant Commerce Clauses.

For the same reasons, certification is not warranted. *See Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir. 1988) ("The test for determining the appropriateness of employing the certification procedure is whether the statute in question is 'readily susceptible' to the proffered narrowing construction that would render an otherwise unconstitutional statute constitutional.").

## II.    MGM'S CLAIMS ARE CONSTITUTIONALLY AND PRUDENTIALLY RIPE.

A cause of action is ripe for judicial review when it "present[s] a real, substantial controversy, not a mere hypothetical question." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citation and quotation marks omitted). "The doctrine's major purpose is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* (citations and quotation marks omitted).

"[S]ince ripeness is peculiarly a question of timing," the analysis is governed by the state of affairs at the time the court makes its ripeness determination. *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974); *see also Am. Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 302 n.4 (2d Cir. 1989) ("In considering the issue of ripeness, we have focused on several events that occurred after the filing of the complaint. . . .  We note that it is irrelevant whether the case was ripe for review when the complaint was filed.  Intervening events relevant to the ripeness inquiry should be considered and may be determinative.").

The facts alleged in MGM's Amended Complaint, and the events that have subsequently unfolded, leave no doubt that this case presents a concrete, actual controversy that can and should be decided by this Court.  As noted, MGM is already suffering injury caused by the Act, and that injury worsens as the Preferred Tribes proceed with their development plans.

### A.   MGM's Claims Are Constitutionally Ripe.

The doctrine of constitutional ripeness, while distinct from standing, shares the "requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." *Nat'l Org. for Marriage*, 714 F.3d at 688 (quoting *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008)).  Indeed, constitutional ripeness "is really just about the first *Lujan* factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'" *Id.*

Defendants rely on the same meritless arguments discussed above to challenge ripeness, viz., that the Act does not cause MGM a present and actual injury, Mot. at 30, and those arguments should therefore suffer the same fate as to ripeness.  *Cf. Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008) ("We have already held that the antitrust harms asserted by the cardholders are sufficiently 'actual and imminent' to constitute Article III injury in fact. For the same reasons, we find that these alleged injuries are not merely speculative or hypothetical, and that judicial review of the cardholders' claims at this time is appropriate."); *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006) ("Because . . . LSC challenges the claim's ripeness on essentially the same grounds as those related to the plaintiffs' standing—it follows that our analysis of LSC's standing challenge applies equally and interchangeably to its ripeness challenge."), *abrogated on other grounds by Bond v. United States*, 131 S. Ct. 2355, 2361 (2011).

### B.   Assuming Prudential Ripeness Is Required, MGM's Claims Are Prudentially Ripe.

Defendants make a final, unwarranted appeal to the doctrine of prudential ripeness, asking this Court to abstain from review of MGM's claims notwithstanding that this Court has subject matter jurisdiction.  *See Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003) (prudential-

ripeness doctrine is nonjurisdictional and hence does not implicate the court's power to act); *see also, e.g.*, *In re Coleman*, 560 F.3d 1000, 1008 n.18 (9th Cir. 2009) ("[T]he question is jurisdictional only if it speaks to *constitutional* ripeness rather than *prudential* ripeness—if a matter is constitutionally ripe . . . [a court] does not lack jurisdiction to consider the case.").

The Supreme Court, however, has recently recognized that the doctrine of prudential ripeness is in tension with a federal court's duty to hear cases within its jurisdiction. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014) ("To the extent respondents would have us deem petitioners' claims nonjusticiable on grounds that are prudential, rather than constitutional, that request is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." (citations and quotation marks omitted)).  Accordingly, it is at best unclear whether "prudential ripeness" is a viable argument as a matter of law.  *See, e.g.*, *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) ("[T]he Supreme Court has cast into some doubt 'the continuing vitality' of the long-established prudential aspects of the ripeness doctrine, specifically the aspects that concern hardship to the parties and fitness of the dispute for resolution.  Instead, the Court addressed the constitutional component of ripeness in terms of standing.  Accordingly, we will address Kiser's claim, which was dismissed as unripe by the district court, using the constitutional standing framework." (citations omitted)); *Dresser-Rand Co. v. Ingersoll Rand Co.*, No. 14-Civ-7222 (KPF), 2015 WL 4254033, at *9 n.8 (S.D.N.Y. July 14, 2015) ("Given this uncertainty, the Court has focused on the constitutional ripeness analysis.").  At a minimum, the Supreme Court's reasoning suggests that prudential ripeness should be interpreted consistently with other exceptions to a court's "virtually unflagging" obligation to decide cases within its jurisdiction— it should apply only in "exceptional circumstances," *Cannady v. Valentin*, 768 F.2d 501, 503 (2d

35

Cir. 1985), and should be an "extraordinary and narrow" exception from the exercise of jurisdiction, *Colorado River*, 424 U.S. at 813.

But even were this Court to consider prudential ripeness, both prongs of that doctrine augur in favor of prompt resolution of MGM's claims.

*First*, MGM's claims are "fit for judicial decision" because MGM's challenge to the Act "presents an issue that is purely legal, and will not be clarified by further factual development." *Susan B. Anthony List*, 134 S. Ct. at 2347 (citation and quotation marks omitted). Moreover, because MGM is already suffering harm by virtue of being denied a fair and equal chance to compete for a casino-development project in Connecticut, the "issues sought to be adjudicated" are not "contingent on future events." *Simmonds*, 326 F.3d at 359 (citation and quotation marks omitted); *see also Ross*, 524 F.3d at 226 ("The injuries alleged by the cardholders are present, ongoing harms. . . . For these reasons, the cardholders' claims are ripe for adjudication."). Indeed, a court recently found to be ripe a challenge to a similar gaming law providing a preference in favor of a tribal casino because the "issues, in this facial challenge to the Gaming Act, are entirely legal in nature and do not require the Court to weigh competing hypothetical interests," and because the law was in effect and being utilized, even though uncertainties remained as to whether the tribe would in fact ever develop a tribal casino. *KG Urban*, 839 F. Supp. 2d at 396.

*Second*, in the absence of prompt review, MGM will continue to suffer hardship and be deprived of its constitutional right to a fair and equal opportunity to compete for casino-development opportunities in Connecticut. That harm to MGM has already begun—the Preferred Tribes and municipalities are exercising their respective rights under the Act right now, leaving MGM to compete at a disadvantage that will only increase with time. This present and

ongoing harm constitutes a "present detriment" to MGM, and so is sufficient to establish prudential ripeness.  Mot. at 32.  Whatever uncertainties may exist as to the actual development of a casino do not negate this present injury to MGM.[15]  *See Nat'l Org. for Marriage*, 714 F.3d at 691 (rejecting request to dismiss on prudential ripeness grounds because "[w]hat future contingencies remain, are not determinative of the questions before us" (citations omitted)); *see also Simmonds*, 326 F.3d at 357 (prudential-ripeness doctrine implicated only when "the parties will not have constitutional rights undermined by the delay").

## CONCLUSION

For the foregoing reasons Defendants' motion to dismiss should be denied.[16]

---

[15] Indeed, all signs point to the Preferred Tribes selecting a proposal no more than two weeks after this brief is filed and having a signed development agreement shortly thereafter.  To that end, the Preferred Tribes have received five responses to their RFP from municipalities and property owners.  *See Proposed Casino Receives Five Bids In Four Towns*, Hartford Bus. J. (Nov. 9, 2015) (attached as Exhibit 5).  The Preferred Tribes have made no secret of the fact that they "intend to enter into an agreement with a municipality and submit it to the legislature at the start of the next scheduled legislative session in February 2016," with the possibility that a new casino "could be up and running six to nine months after approval."  Am. Compl. ¶¶ 64–65 (citation and quotation marks omitted).  More recently, the President of the Mohegan Tribal Gaming Authority told the investment community that the Preferred Tribes are "reviewing the proposals and expect to make announcements in December and be in a position to recommend ratifying legislation when the state legislature reconvenes in February."  Transcript of Mohegan Tribal Gaming Authority Fourth Quarter Fiscal 2015 Earnings Call (Nov. 19, 2015) at 11 (attached as Exhibit 11).  Indeed, the Preferred Tribes recently explained that they and their supporters are "ask[ing] Connecticut's lawmakers to help us pass a bill next year to make this [new casino] a reality."  Press Release (Sept. 10, 2015) (attached as Exhibit 9).

[16] Because Defendants do not claim that sovereign immunity bars MGM's claims against Defendants Merrill and Harris, its claims against Governor Malloy are not necessary to maintain this suit—particularly because any judgment against Defendant Merrill or Defendant Harris finding that any portion of the Act is invalid will automatically result in the remainder of Act becoming inoperative and having "no effect," as provided by the Act's severability clause.  Act. § 1(g).  Thus, MGM does not oppose Defendants' motion with respect to Governor Malloy.

December 2, 2015

Respectfully submitted,

James K. Robertson Jr., Ct#05301
Ann Rubin, Ct#04486
Carmody Torrance Sandak & Hennessey LLP
50 Leavenworth Street
Waterbury, CT 06721
Tel: 203.575.2636
Fax: 203.575.2600
jrobertson@carmodylaw.com

Neil K. Roman, phv07712
Cléa Liquard, phv07714
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: 212-841-1221
Fax: 212-841-1010
nroman@cov.com

Edward H. Rippey, phv7737
Kevin King, phv07715
Thomas R. Brugato, phv07713
Covington & Burling LLP
One CityCenter
850 Tenth St., NW
Washington, DC 20001
Tel: 202-662-5171
Fax: 202-778-5171
erippey@cov.com

*Counsel for Plaintiff*

## CERTIFICATION

I hereby certify that on December 2, 2015, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

James K. Robertson, Jr.